# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 0 3 2024

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

K.H. and J.H., as Parents and
Next Friends of A.H.,

　　　　Plaintiffs

　　　v.

PULASKI COUNTY SPECIAL
SCHOOL DISTRICT,

　　　　Defendant

§
§
§
§
§
§
§
§
§
§
§
§
§
§

CASE NO. **4:24-cv-1062-LPR**

This case assigned to District Judge **Rudofsky**
and to Magistrate Judge **Kearney**

---

# COMPLAINT

---

K.H. and J.H. for their Complaint state:

## I. PARTIES

1.　　K.H. and J.H. are the parents of A.H. and will be collectively referred to as "Parents."

2.　　A.H., a minor, is a child with a disability as defined by the Individual with Disabilities Education Act ("IDEA"), 20 U.S.C. §1401(3)(A)(i).

3.     Plaintiffs reside in Pulaski County, Arkansas, and A.H. attended

school in the Pulaski County Special School District ("PCSSD").

4.     PCSSD is an Arkansas school district and a public corporation

that may be sued in its own name. *See* Ark. Code Ann. §6-13-102(a).

Arkansas school districts are *not* state agencies immune from suit

pursuant to the Eleventh Amendment. *See Herts v. Smith*, 345 F.3d

581, 588 (8th Cir. 2003).

5.     Parents seek to recover their attorneys' fees and costs as the

prevailing party in proceedings under the IDEA. *See* 20 U.S.C.

§1415(i)(3)(B)(i). Parents also seek review of the HO's decision in

H-24-48 because the HO failed to award appropriate relief. *See* 20

U.S.C. §1415(i)(2)(A).

## II. JURISDICTION AND VENUE

6.     This Court has jurisdiction over Parents' IDEA fee claim

pursuant to 20 U.S.C. §1415(i)(3)(A).

7.     This Court is the proper venue for Plaintiffs' claims. *See* 28

U.S.C. §1391(b). Plaintiffs reside in Pulaski County, Arkansas. PCSSD

2

is located in Pulaski County. The events giving rise to Plaintiffs'

Complaint occurred in Pulaski County. Pulaski County is in the

Eastern District of Arkansas, Central Division. *See* 28 U.S.C. §83(a)(1).

### III. STATEMENT OF FACTS

8.    On December 21, 2023, Parents filed a due process complaint

with the Arkansas Department of Education ("ADE") alleging PCSSD

denied A.H. a free appropriate public education ("FAPE") in the

least-restrictive environment ("LRE") in violation of the IDEA.

9.    ADE numbered Parents' due process complaint as H-24-27 and

assigned the case to an impartial due process hearing officer ("HO").

10.    On January 8, 2024, Parents filed a due process complaint with

ADE alleging PCSSD denied A.H. a FAPE in the LRE in violation of

the IDEA.

11.    ADE numbered Parents' due process complaint as H-24-30 and

assigned the case to a HO.

12.    H-24-27 and H-24-30 were consolidated for a single due

process hearing.

3

13.    The due process hearing in H-24-27 and H-24-30 lasted four days, starting April 11, 2024, and ending on April 29, 2024. The HO heard the testimony of ten witnesses, including Parents.

14.    On June 4, 2024, the HO issued a Final Decision and Order in H-24-27 and H-24-30 finding that PCSSD denied A.H. a FAPE due to procedural and substantive violations of the IDEA.

15.    The HO's decision (redacted) in H-24-27 and H-24-30 is attached hereto as **Exhibit A** and incorporated by reference pursuant to Rule 10(c) of the Federal Rules of Civil Procedure.

16.    The HO's decision in H-24-27 and H-24-30 awarded Parents actual relief on the merits of their claim that materially altered the legal relationship between the parties by modifying PCSSD's behavior in a way that directly benefited A.H. *See Birmingham v. Omaha Sch. Dist.*, 298 F.3d 731, 734 (8th Cir. 2002).

17.    On May 23, 2024, Parents filed a due process complaint with ADE alleging PCSSD failed to provide A.H. a FAPE in a timely manner prior to Parents' enrolling A.H. in a private school, Compass

4

Academy, and seeking tuition reimbursement and other costs of that

enrollment pursuant to 20 U.S.C. §1412(a)(10)(C)(ii).

18.    ADE numbered Parents' due process complaint as H-24-48 and

assigned the case to a HO.

19.    The due process hearing in H-24-48 lasted four days starting

September 18, 2024, and ending on October 24, 2024. The record

from H-24-27 and H-24-30 was incorporated into the record of

H-24-48. The HO heard the testimony of nine witnesses, including

Parents.

20.    On November 27, 2024, the HO issued a Final Decision and

Order in H-24-48 finding in favor of Parents and awarding Parents

one-year of the relief requested.

21.    The HO's decision (redacted) in H-24-48 is attached hereto as

**Exhibit B** and incorporated by reference pursuant to Rule 10(c) of

the Federal Rules of Civil Procedure.

22.    The HO's decision in H-24-48 awarded Parents actual relief on

the merits of their claim that materially altered the legal relationship

between the parties by modifying PCSSD's behavior in a way that directly benefited A.H. *See Birmingham v. Omaha Sch. Dist.*, 298 F.3d 731, 734 (8th Cir. 2002).

## IV.  CLAIMS

### Count I: IDEA Review

23.    Parents seek review of the HO's decision in H-24-48 because the HO failed to award Parents appropriate relief, and as a result, Parents are a "party aggrieved" by the HO's decision. *See* 20 U.S.C. §1415(i)(2)(A).

24.    While the HO in H-24-48 correctly found Parents were entitled to tuition reimbursement and reimbursement for transportation, the HO erred in failing to provide Parents complete relief.

25.    The HO only awarded one-year of tuition and transportation reimbursement when, based on the HO's findings, Parents were also entitled to prospective relief. Specifically, appropriate relief required PCSSD to continue to pay A.H. tuition at Compass Academy and to provide transportation each successive school year until PCSSD

6

offered A.H. an IEP in a PCSSD school that would provide him a FAPE in the LRE.

26.    Parents' due process complaint in H-24-48 requested that PCSSD be ordered to "Continue to pay Compass Academy all tuition, costs and fees for [A.H.] to attend the Compass Academy - to include reimbursement to Parents for transportation through the 2024-25 school year and until such time as the District offers [A.H.] an appropriate IEP." **Due Process Complaint (H-24-48), Appropriate Relief, ¶C.**

27.    Parents post-hearing brief in H-24-48 more specifically requested that PCSSD be ordered to "Continue to pay for and transport [A.H.] to attend Compass Academy unless before June 30 of 2025 (and each June 30 thereafter so long as [A.H.] remains at Compass Academy) the District offers [A.H.] an IEP that will provide her a FAPE in the District." **Parents' Post-Hearing Brief, Prayer, ¶6.**

28.    Accordingly, Parents request this Court review the

administrative record and award Parents appropriate relief as

described above.

### Count II: IDEA Attorneys' Fees and Costs

29.    Parents are the prevailing party in proceedings under the

IDEA and may be awarded reasonable attorneys' fees and

costs. *See* 20 U.S.C. §1415(i)(3)(B)(i).

30.    The HO's decisions in H-24-27, H-24-30, H-24-48

awarded Parents actual relief on the merits of their claim that

materially altered the legal relationship between the parties by

modifying PCSSD's behavior in a way that directly benefited

D.H.G. *See Birmingham v. Omaha Sch. Dist.*, 298 F.3d 731,

734 (8th Cir. 2002).

31.    The IDEA does not establish a limitations period for an

IDEA fee claim. *See* 20 U.S.C. §1415(i)(3). The Eighth Circuit

has established a 90-day limitations period that starts when the

losing party's time to appeal runs out, or 180 days from the

HO's decisions, June 4, 2024 and November 27, 2024. *See Richardson v. Omaha Sch. Dist.*, 957 F.3d 869, 875-76 (8th Cir. 2020), cert. denied, 141 S. Ct. 2851 (2021); 20 U.S.C. §1415(i)(2)(B) (90 days to appeal). Accordingly, Parents' IDEA fee claims are timely.

32.     Parents will submit a properly supported motion for attorneys' fees within 14 days of this Court issuing its opinion on review the HO's decision in H-24-48 and denying PCSSD's appeal(s). *See* Local Rule 54.1(a).

WHEREFORE, Parents pray that the Court review the HO's decision in H-24-48 and award appropriate relief as described above; that any appeal by PCSSD be dismissed with prejudice; that judgment be entered in favor of Parents; that Parents be awarded attorneys' fees as the prevailing party in proceedings under the IDEA; and, that Parents be awarded all other just and proper relief to which they may be entitled. Respectfully submitted,

9

Theresa L. Caldwell
Arkansas Bar Number 91163
Attorney for Plaintiffs
**CALDWELL LAW OFFICE**
14 Alban Lane
Little Rock, Arkansas 72223
Tel.: 501-414-0434
E-mail: tlcatty@gmail.com

**ARKANSAS DEPARTMENT OF EDUCATION**
**SPECIAL EDUCATION UNIT**

**XXXXXXXX and XXXXX**
**XXXXXXXX, AS PARENTS OF**
**XXXXXXXXXXXXXXXXX,**
                    **Petitioner/Parents**

**VS.**
                                                            **NOS. H-24-27 and**
                                                          **H-24-30, consolidated**

**PULASKI COUNTY SPECIAL**
**SCHOOL DISTRICT,**
                     **Respondent/District**

## HEARING OFFICER'S FINAL DECISION AND ORDER

XXXXXXXXXXXXXXX ("Student") is a nine-year-old child with a learning disability who is eligible for special education services from the Pulaski County Special School District ("District"). On January 8, 2024, XXXXXXX and XXXXXXXXXXX ("Parents" or as applicable, "Mother" or "Father"), filed a request for a due process hearing pursuant to the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 et seq. ("IDEA") alleging that District denied Student a Free Appropriate Public Education ("a FAPE") based in part on its failure to evaluate Student in all areas of suspected disability. Parents request the following relief: (1) an occupational therapy evaluation by an evaluator of their choice; (2) a functional behavior analysis conducted by a private Board-Certified Behavior Analyst; and (3) compensatory education if the hearing officer finds a denial of FAPE.

**EXHIBIT A**

## ISSUES PRESENTED

A. Whether the District failed to assess Student in all areas of disabilities for which he is eligible for special education services, when the evaluation did not include dyslexia and dyslexia services were not made a part of the IEP; and

B. Whether District denied Student a FAPE by either failing to develop an appropriate IEP or in implementing his IEP, Behavior Management Plan and Crisis Plan, which resulted in his disability-related maladaptive behaviors at school negatively affecting his academic progress.

## NON-JUSTICIABLE ISSUES

Parents also allege that District's conduct constitutes disability discrimination in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165. Parent also asserts retaliation based on the disability discrimination claims as well as retaliation for the exercise of Student's free speech rights under the First and Fifth Amendments to the U.S. Constitution. This Hearing Officer has no jurisdiction over disability discrimination claims or violations of freedom of speech. *See* Ark. Dept. of Ed., Spec. Ed. Rules §10.01.22.1. Accordingly, to the extent Parents' due process complaint raises disability discrimination claims and violations of freedom of speech, those claims are DISMISSED WITHOUT PREJUDICE.

## PROCEDURAL HISTORY

On December 21, 2023, District filed a Due Process Complaint requesting a hearing pursuant to the IDEA to show that its occupational therapy evaluation of Student was appropriate. The assigned case number for that case is H-24-27. The due process hearing was scheduled to begin on January 30, 2024.

On January 8, 2024, Parents filed a Due Process Complaint ("Complaint") requesting a hearing pursuant to the IDEA. The assigned case number for that case is H-24-30. The two cases were consolidated by Order dated January 26, 2024, and a hearing was set to begin on February 27, 2024. A continuance was granted for good cause and the hearing rescheduled for April 10, 2024, to April 12, 2024.

At the pre-hearing conference held on April 5, 2024, Parents advised that they had paid for an independent occupational therapy evaluation, which was the sole subject of District's complaint in H-24-27. To request reimbursement for that independent evaluation, Parents would have to either amend their complaint or file a second complaint. District opposed an amendment. Accordingly, Parents withdrew their request for an independent evaluation, and the parties agreed that District's complaint was now moot. *See* Pre-Hearing Conference Tr., pp. 14-17; Parents Post-Hearing Brief, p. 27; District Post-Hearing Brief, p. 3.

In addition to its response to Parents' Complaint, District filed a Motion to Assign Burden of Proof and a Motion to Limit Length of Hearing. The Motion to Assign Burden of Proof was granted, and the burden of proof assigned to Parents. The Motion to Limit Length of Hearing was denied.

Parents' Complaint alleges that District failed to provide Student a FAPE based in part on its failure to evaluate Student in all areas of suspected disability. For relief, Parents request that District be ordered to: (1) provide Parents an occupational therapy evaluation by an evaluator of their choice; (2) contract with a private Board-Certified Behavior Analyst ("BCBA") approved by Parents to conduct an FBA, to help the IEP team develop a BIP, and to train Student's teachers and support staff on implementation of the BIP to the extent this remains an issue; (3) provide Student compensatory education for lost learning time resulting from the change of

placement, suspensions, and the inappropriate IEP; an expired IEP, and/or the District's failure to implement his IEP.[1]

Having been given jurisdiction and authority to conduct the hearing pursuant to the IDEA, and Arkansas Code Annotated §§ 6-41-202 through 6-41-223, Cheryl L. Reinhart, J.D., Hearing Officer for the Department, conducted a closed impartial hearing. Parties present for the hearing were Parents, represented by Ms. Theresa L. Caldwell, Caldwell Law Office, Little Rock, Arkansas, and Stephanie Cole, the District's Special Education Director, represented by Mr. Jay Bequette, of Bequette, Billingsley & Kees, PA, of Little Rock, Arkansas. Audra Alumbaugh was present as an advocate for Parents.

Testimony was heard on April 11, 12, 15, and 29, 2024. *See* Transcript, generally, Vols. I-IV. In addition to Parents, the following witnesses testified in this matter: Ellen Morris, Student's special education teacher, third grade, Joe T. Robinson Elementary School; Ruby Blanton, Student's general education teacher, third grade, Joe T. Robinson Elementary School; Michele Pickett, Principal, Joe T. Robinson Elementary School; Tammy Helmick, counselor, Joe T. Robinson Elementary School; Pamela Keith, lead dyslexia teacher for District; Dr. M. Tracy Morrison, Engage of Jonesboro, expert witness for Parents; RaDiah Reynolds, Speech/Language Pathologist and Certified Academic Language Therapist, expert witness for Parents; and Missy Shipman, occupational therapist for District.

---

[1] The parties submitted their post-hearing briefs on May 24, 2024. Parents state in the brief that they placed Student in Compass Academy on February 12, 2024, after filing their Complaint for Due Process. Parents raise the issue of private placement for the first time in their post-hearing brief, and request for the first time that District be ordered to pay Compass Academy tuition as compensatory education. Parents' Post-Hearing Brief, pp. 27, 32. The issue was not raised at the hearing, and there was no evidence at the hearing as to the appropriateness of private placement. Therefore, District did not have an opportunity to defend a request for private placement. Accordingly, the issue of private placement is not considered in this decision.

## FINDINGS OF FACT

### A. Background

At the time of the Complaint, Student, a nine-year-old male now in the third grade, had been enrolled at District in Robinson Elementary School since kindergarten. Student suffered from extreme neglect until he was adopted (along with his sister) by Parents when he was less than two years old. Tr. Vol. III, p. 57. At age four, Student was diagnosed with attention deficit hyperactivity disorder ("ADHD") and Unspecified Disruptive, Impulsive-Control, and Conduct Disorder. Parent Exh., p. 407. Student was also evaluated for occupational therapy services by The Allen School, a school for the treatment of children with intellectual and developmental disabilities, and determined to need only consultative occupational therapy services. Parent Exh., pp. 481-484. Student attended preschool at The Allen School for two years, then enrolled in kindergarten at District. Tr. Vol. III, pp. 58-59. Father testified that, at that time, Student was "very intelligent" but his social skills were an issue, although not "severely pronounced," had sensory issues (for example, things that touched him, loud noises, lots of activity), was somewhat oppositional, and sucked his thumb. Tr. Vol. III, pp. 60-61. Tr. Vol. III, p. 59. Despite these issues, Student did well in pre-kindergarten, kindergarten, and first grade, according to Father. Tr. Vol. III, pp. 59-62.

Student was first referred for special education in kindergarten on September 17, 2020, and District determined that he was eligible for special education services on December 18, 2020. Parent Exh., p. 302. The evaluation conducted by District noted that Student had below average cognitive ability and "a wide range of academic scores." Dist. Exh., p. 17, 22. The evaluation also noted reading comprehension and math as strengths, but stated that Student showed weaknesses in "basic reading skills, math calculation skills, and writing skills, including

spelling." Dist. Exh., p. 22. The evaluator recommended special education eligibility under Other

Health Impairment ("OHI") based on the evaluation and his diagnoses at that time of ADHD and

Unspecified Disruptive, Impulsive-Control, and Conduct Disorder. Id., p. 23. District identifies

Student's initial eligibility determination date as December 18, 2020. Id., pp. 27-28. As Student's

eligibility date falls in December, his IEPs are reviewed in the middle of each school year,

covering the last half of one school year and the first half of the next.

**B.** **2021-2022 School Year (7/1/21 to 6/30/22) – First Grade**

*The statutory period for this case begins on January 8, 2022, the middle of Student's first-grade year.*

Father testified that in first grade, Student exhibited more "push back when given a

directive." Tr. Vol. III, p. 62. On October 27, 2021, Student's IEP team met to consider the need

for a functional behavioral assessment ("FBA"). Parent Exh., p. 299. The team noted that Parents

were considering seeking an evaluation for autism from the UAMS Dennis Developmental

Center ("DDC"), but due to the waiting period District would consider a crisis/safety plan for

Student. Parent Exh., p. 299-300.

Student's IEP for the period of 12/16/21 to 12/16/22 (mid-first grade to mid-second

grade) (Parent Exh., pp. 346-355), provided special education services of 30 minutes each per

day of direct instruction in literacy and math, and related services of 60 minutes per month for

occupational therapy consultation. Parent Exh., p. 351. The IEP also provides multiple

accommodations for Student (Id., p. 350), strategies for behavior management (Id., p. 349), one

goal for literacy, and one goal for math (Id., p. 352).

The IEP team met on January 13, 2022 to discuss Student's classroom behavior, and

develop a behavior management plan. *See* Parent Exh., pp. 337-341. Two months later on March

8, 2022, the IEP team met again to create a Crisis Plan to address Student's elopement tendencies. Parent Exh., pp. 346, 365-367. The team also sought parental consent for an assessment to determine whether Student needed a one-on-one paraprofessional. Parent Exh., p. 368. Parent Exh., p. 346.

**C.** **2022-2023 School Year (7/1/22 to 6/30/23) – Second Grade**

Student's second grade year saw several significant developments for Student: school-based mental health counseling, a dyslexia diagnosis, an increase in maladaptive behaviors leading to out-of-school suspensions, the development of behavior management and crisis plans, and an evaluation and diagnosis of autism at the UAMS Dennis Developmental Center (DDC).

**1. School-based Mental Health Services**. During the second grade, Student began receiving school-based mental health services from Youth Home, provided by Ann Smith. Tr. Vol. I, p. 161. Morris, Student's special education teacher, testified that the school-based mental health services were private, and were not provided through Student's IEP. Id. Morris stated that she had invited Ann Smith to Student's IEP meetings. Id., p. 164. Student's principal testified that Ann Smith met with Student weekly and had a "good rapport" with Student. Tr. Vol. II, pp. 124-125. District would call on her at times for her assistance during behavioral problems and her office was one of her "safe places." Id.

**2. Dyslexia Diagnosis and Services**. Second grade marked the initiation of District providing dyslexia intervention services to Student. Tr. Vol. I, p. 17. At that time, his Lexile score was at a beginning reader level. Id. Morris testified that she had noted Student had handwriting and written expression deficits also. Id., pp. 23, 76. On November 30, 2022, a Level 1 Dyslexia Screener was administered to Student, with the results showing that Student was considerably below expected level in decoding, word recognition, fluency rate,

spelling/encoding, written expression, and comprehension. Parent Exh., p. 573. Parent consented

to a Level 2 Dyslexia Screening, and on January 5, 2023, Parents provided consent for District to

begin providing services in the Dyslexia Program. Parent Exh., p. 571. Principal, Michele

Pickett, testified that Student began receiving dyslexia services on March 2, 2023. Tr. Vol. II, p.

144. Dyslexia services were not made a part of Student's IEP, because, as Pickett explained, "In

Pulaski County, because we diagnose characteristics of dyslexia, it is part of the general

education." Tr. Vol. II, p. 178.

According to the testimony of several witnesses, Student was exposed to at least three

different reading programs:

- Morris used Phonics First, a phonics curriculum approved by the Department as a dyslexia curriculum. Morris chose Phonics First because it had a strategic and systematic, multi-sensory approach that she believed would be beneficial for her students with reading fluency issues (Tr. Vol. I, pp. 93-94);
- Blanton, Student's regular education teacher, used the District's Benchmark curriculum for reading (Tr. Vol. II, p. 95); and
- The "dyslexia person" used the Sonday System to deliver dyslexia intervention services to Student (Tr. Vol. II, p. 95).

RaDiah Reynolds, a Certified Academic Language Therapist ("CALT") and speech-

language pathologist, testified as an expert witness for Parents. Tr. Vol. III, p. 104. Ms. Reynolds

has worked in dyslexia intervention since 2018, and has been a speech-language pathologist

since 2010. Id. The question was raised to Reynolds about whether using multiple reading

programs could pose a problem for Student, given his characteristics of autism and clear

difficulties with reading comprehension and written expression. Tr. Vol. III, pp. 152. Reynolds

stated that it would be very confusing for a student with a language disorder. Id. However, it is

not uncommon for educators to pull from different reading programs to address a student's

individualized needs. Tr. Vol. III, pp. 150. She also pointed out that she did not see much progress in Student's dyslexia worksheets that she reviewed from Parents exhibits. Tr. Vol. III, p. 142.

**3. 12/9/22, IEP Annual Review**. District conducted the annual review of Student's IEP on December 9, 2022, of his second-grade year. Parent Exh., pp. 220-230.

**4. April 2023 Suspensions**. Student was suspended from school on April 13, 2023, April 20, 2022, and April 21, 2023 (Dist. Exh., pp. 668, 670-671), for the following behavioral incidents described on the subsequent Manifestation Determination Review ("MDR"):

- April 12, 2023, [Student] pushed a student so hard that the student crushed his glasses against a pole and he also tried to run away from the school campus after this incident and security had to run after him to make sure he was safe.
- April 18, 2023, right before NWEA testing Ms. Sinh and Mrs. Willmuth tried to get [Student] to get off his laptop to get into the NWEA test and got mad because he had to get off his game. He told the teachers to "get out of my business!" and "get away from me." After Mrs. Willmuth took his laptop away, he ran out of the classroom and the school building. Ms. Sinh chased after him to make sure he did not run into Highway 10. Dist. Exh., p. 224.

**5. May 1, 2023, IEP Team Meeting.** The IEP team met on May 1, 2023, to review Student's IEP in light of his recent behavioral incidents and discipline. Parent Exh., pp. 241-250. The IEP team amended the IEP by adding strategies for behavior management, and amended Student's behavior plan and crisis safety plan. Parent Exh., p. 257.

**6. May 2, 2023, PBIS Major Referral; OSS.** On May 2, 2023, Student was involved in a behavioral incident primarily over attempts to have him stop using his computer. Student was screaming, yelling disrespectfully at his teachers, eventually kicking and knocking over items in the library. After trying to elope, Student hit and kicked the School Resource Officer, and threatened to kill him and the behavior specialist who was assisting. The officer handcuffed

Student to a chair, and Student continued the behaviors. Mother was called to the school. Student received a five-day suspension, but was allowed to return to school one day early, because "[District] recognizes the importance of being in school." Dist. Exh., pp. 175-176.

7. **May 4, 2023, Dennis Development Center Evaluation**. Student was evaluated for possible autism by the UAMS Dennis Development Center ("DDC") on May 4, 2023. *See* Parent Exh., p. 400-422. As a result of the evaluation, DDC diagnosed Student with "Autism Spectrum Disorder, without accompanying basic language impairment, without accompanying intellectual impairment, and requiring level 1 support in the area of social communication and level 2 support in the area of restricted, repetitive behaviors." Id., p. 405-406. The DDC report recommends that Student "be considered for placement into *speech-language therapy services* through the local school district to address deficits in social/pragmatic language skills," and considered for "*direct occupational therapy services* ... given his difficulties in the school setting," particularly to "address sensory processing issues [and] difficulty with handwriting." (emphasis added) Id., pp. 405, 417. Mother testified that District advised her that based on those evaluations, "the pragmatic speech and OT therapy were not necessary for learning in school, that was like a life skill, not at school." Tr. Vol. IV, p. 65.

8. **May 8, 2023, IEP Team Meeting**. The IEP team met again on May 8, 2023, for the purpose of discussing Student's behavior and the need to update his IEP, behavior plan, and crisis plan. Parent Exh., p. 266. The team added 30 minutes per day of social skills direct instruction, and "brainstormed ideas" on updates to the behavior plan and crisis plan. Id. Parents advised the IEP team at that meeting that Student was evaluated by the DDC for possible autism on May 4, 2023, but did not yet have the DDC report. Id. The IEP team amended the IEP (Dist. Exh., p. 213), amended Student's Behavior Management Plan (Dist. Exh., pp. 235-240), and

conducted an FBA (Dist. Exh., pp. 226-233).

      **9. May 8, 2023, MDR.** The IEP team also conducted an MDR on May 8, 2023, which resulted in a five-day suspension. Dist. Exh., pp. 224-225. However, there are no days of suspension shown in Student's attendance record. Dist. Exh., p. 671.

      **10. Receipt of DDC Evaluation Report**. Parents provided a copy of the DDC report to District on or about the last day of school. Tr. Vol. IV, p. 64. A copy of the report bearing a date-stamp of June 7, 2023, appears at Dist. Exh., p. 179.

### D. 2023-2024 School Year (7/1/23 to 1/8/24) – Third Grade

      The period from July 1, 2023, to January 8, 2024, was a busy time for Student's IEP team, as well as a difficult four months for Student at the beginning of his third-grade year.

      **1. July 12, 2023, IEP Team Meeting.** District met, by video conferencing, to review the DDC evaluation that provided a new diagnosis of autism. *See* Parent Exh., pp. 1-15, 17-18. The IEP team for this meeting consisted of Parents and two persons from the District -- Melissa Kilpatrick, serving in the roles of special education teacher, general education teacher, and LEA representative, and Rebecca Smith, who served as the individual to interpret evaluation results. Parent Exh., p. 10, 17-18.

      Although Parents had already provided a copy of the full DDC evaluation to District, the IEP team told Parents at the meeting that they did not have a copy; Parents emailed a copy to District during the meeting. Tr. Vol. IV, p. 64. As a result of the new diagnosis, the team approved new evaluations for achievement, executive function, behavior, and sensory processing. Id., p. 17. The team amended the IEP to add a new behavior goal and revised Student's accommodations. Id.

      **2. Evaluations.** Following the recommendations of the IEP team made on July 12, 2023,

District conducted a specialized reevaluation (September 14, 2023), and an occupational therapy initial evaluation (October 2, 2023).

      **(a) 9/14/23 Specialized Reevaluation**. The specialized reevaluation was conducted by Rebecca Smith, M.S., District's licensed school psychology specialist. See Parent Exh., pp. 372-399. The report recommends that Student "meets eligibility criteria for special education services under the IDEA category of Autism." Id., p. 392. Conclusions from the evaluation included:

- … multiple characteristics of his ASD diagnosis *affecting his acquisition of educational objectives as well as socially*.
- …significant adaptive skills deficits in Communication, Functional Academics, and Social areas…
- [BASC-3 adaptive scores] At-Risk and/or Clinically Significant score [both school and home settings] in … Aggression, Conduct Problems, Depression, Attention Problems, Atypicality, Adaptability, Leadership, Anger Control, Bullying, Emotional Self-Control, Executive Functioning, Negative Emotionality, Resiliency, ADHD Probability, Autism Probability, Emotional Disturbance Probability, and Functional Impairment…
- [BRIEF-2 Scores (teacher form)] … Clinically Elevated ratings in the areas of Inhibit, Self-Monitor, Shift, Emotional Control, and Working Memory with Potentially Clinically Elevated scores in Initiate, Plan/Organize, and Organization of Materials …
- [KTEA-3 academic skills] … below average abilities in basic reading skills, reading comprehension, math problem solving, math calculation, and silent reading fluency, and word recognition fluency … [and] significant deficits in written expression and decoding abilities.

      **(b) 9/8/23 Occupational Therapy Initial Evaluation.** The occupational therapy initial evaluation was conducted on September 8, 2023, by Missy Shipman, an occupational therapist employed by District. Tr. Vol. IV, p. 112. Shipman has a master's degree from the occupational therapy program at the University of Central Arkansas. Id. Shipman's report (dated October 2, 2023) concluded that consultative occupational therapy services was all that Student

needed. Dist. Exh. p. 273-301. She recommended that, "[Student]'s delays in executive functioning skills, social skills, and sensory sensitivity and avoidance do affect his ability to participate in grade level activities ... [but] can be adequately addressed through consultative occupational therapy services ... [of] 15 minutes ... each week." Dist. Exh., p. 273.

That conclusion was strongly challenged by Dr. M. Tracy Morrison, who testified as an expert witness for Parents. See Tr. Vol. III, pp.7-54. Dr. Morrison is an occupational therapist with advanced post-doctoral training for four years in cognitive neuroscience. Tr. Vol. III, p. 7; *see also* Parent Exh. pp. 732-737. Dr. Morrison developed assessments for executive functioning that are used as "gold standard" in occupational therapy and psychology. Tr. Vol. III, pp. 7-8. She now also operates a school, Engage, for 130 students, and provides outpatient behavior, speech, and occupational therapy services. Id. The school specializes in students who have ADHD, autism, and high anxiety. Id. Morrison testified that she had reviewed District's occupational therapy evaluation, and it is her opinion that the conclusion of the occupational therapist did not align with the data in the report. The evaluation measures Student's Visual-Motor Integration ("VMI") score at 1.4 standard deviations below average, but his visual perception is above average and motor coordination is average. Tr. Vol. III, p. 21; Parent Exh., p. 467. Morrison testified that the evaluator should have conducted a Bruininks Oseretsky Test of Motor Proficiency ("BOT") to determine the reason for Student's low VMI in light of the results for visual perception and motor coordination. Tr. Vol. III, pp. 21-24. While the evaluator recognized that Student's drawing patterns "were immature," citing that he drew bottom to top and right to left, she stated that "this did not affect the quality of his performance." Id., pp. 24-25; Parent Exh., p. 467. According to Dr. Morrison, the evaluator's opinion should not negate the qualitative test data, and the evaluator should have gone deeper with the testing to determine why

Student's VMI was so low. Id. If Student is struggling with fine motor skills, "he is going to fall behind in writing, possibly reading, he is going to struggle with precision, line, shapes, writing words, that he is probably going to experience a fair amount of anxiety when it comes to writing assignments… [I]t is like asking a five-year-old to do third grade work and then grading them at that level." Id., p. 26. Dr. Morrison further questioned the validity of the School Function Assessment and the Sensory Profile of the evaluation. Id., pp. 28-33. Morrison testified that if a student falls below one standard deviation on the Sensory Profile, then occupational therapy intervention is required. Id., p. 34. Finally, Dr. Morrison testified that the executive functioning testing was not a standardized test with quantitative data. Id., pp. 36-37.

Shipman's report does not mention the DDC evaluation and diagnosis of autism. In fact, Shipman testified that she was not aware of the diagnosis and District did not provide her with the report "until well after" her evaluation. Tr. Vol. IV, pp. 132-133. While she conducted the evaluation on September 8, 2023, Shipman noted in her October 2, 2023, consultation notes that she discussed with the IEP team "executive functioning and Dennis Developmental report," noting that Student's diagnosis was changed to autism. Parent Exh., p. 489. Shipman testified that knowing that diagnosis would be a considerable influence on her evaluation of Student. Id. Yet, two months later, Shipman's 2022-2023 Occupational Therapy Annual Review dated December 8, 2023, still does not reference the diagnosis of autism or acknowledge the DDC evaluation. *See* Parent Exh., pp. 474-475. Shipman also testified that she did not know that Student was still sucking his thumb in the third grade, and that it was "concerning." Tr. Vol. IV, p. 132.

**3. September 21, 2023, OSS**. On September 21, 2023, Student received a PBIS Major Referral for being out of the classroom without permission, taking a balloon and refusing to

release it, walking into other classrooms, and slapping a teacher on the leg. Student received a one-day OSS. Dist. Exh., p. 589.

    **4. October 2, 2023, IEP Team Meeting**. The IEP team met on the morning of October 2, 2023, to review the DDC evaluation, the new specialized evaluation, and new occupational therapy evaluation. Dist. Exh., p. 324. The team adopted the occupational therapist's recommendation The team added some accommodations to "help with executive functioning concerns." Parent Exh., p. 21. The team also noted his primary diagnosis as autism. Parent Exh., p. 36.

    **5. October 2, 2023, OSS**. On the afternoon of October 2, 2023, Student left his classroom, and was intercepted by the School Resource Officer and another teacher. Upon his return to the classroom, he threw a Chromebook, knocked over a desk, and left the classroom again. Student received a two-day OSS Dist. Exh., p. 587.

    **6. October 13, 2023, IEP Team Meeting**. The IEP team met to consider one-on-one paraprofessional support for Student following the OSS. Parent Exh., pp. 39-40. The team added services for instruction and goals to support his needs in the area of emotional control. His behavior plan was revised and the Check-in/Check-out sheets amended to match the behavior goals. Student's use of the Chromebook, which leads to behavior problems, was discussed, and District decided not to remove Student's access to the Chromebook. Parent Exh., p. 57.

    **7. October 16, 2023, OSS**. On October 16, 2023, Student became upset when his teacher locked his Chromebook. He left his classroom and went to another room down the hall where he locked himself in. When the door was unlocked, he ran to another

office, turned chairs over, hit his mental health counselor, and eloped from the building. Student received a one-day OSS. Dist. Exh., p. 585.

8. **October 23, 2023, OSS.** On October 23, 2023, Student received a PBIS Major Referral resulting in a three-day OSS, for arguing with his teacher over unifix cubes and his Chromebook, then escalating to throwing items off of her desk, leaving the classroom, cursing his mental health counselor when she encountered him, knocking over desks and a utility cart, slapping his teacher twice, and throwing objects at a student. Dist. Exh., p. 582.

9. **October 27, 2023, IEP Team Meeting.** The IEP team met again to discuss Student's problematic behaviors, and to again discuss a one-on-one paraprofessional to support Student. Parent Exh., p. 59. The team decided to delay adding the paraprofessional until a student support assessment could be conducted, and instead provided a temporary student support paraprofessional. Parent Exh., p. 71. The Notice of Action further states, "Robinson Elementary has requested behavior support services with the district Behavior Intervention Specialist. [Student]'s parents are considering ABA therapy for behavior support at this time. Id.

10. **October 30, 2023, OSS.** Student received another PBIS Major Referral resulting in a one-day OSS after becoming upset about being asked to put his Chromebook away, and his behavior escalated to walking around the room knocking things off the teacher's desk, throwing items, kicking book bins and knocking books onto the floor. Dist. Exh., p. 583.

11. **November 3, 2023, OSS.** Student received a PBIS Major Referral when, on November 3, 2023, he became angry about putting away his Chromebook, and escalated into threatening to throw his Chromebook, chairs, and cool-down crate at the teacher. Student began yelling at the teacher and School Resource Officer to "shut the [f***] up; shut the hell up." He

then threw items out of the cool-down area, and hit the School Resource Officer. Student was given a three-day suspension. Dist. Exh., p. 580.

12. **November 13, 2023, MDR and OSS**. Student received a PBIS Major Referral when he "told another student to shut the [f***] up and then got up from his seat and got in the other student's face and said, 'I'm about to knock your face off.' ..." Dist. Exh., p. 578. This OSS now brings the number of days that Student has been suspended since the first of school to twelve. District. Exh., p. 672. District conducted an MDR on November 13, 2023, determined that his behavior was disability-related and administered a four-day OSS.

13. **November 27, 2023, IEP Team Meeting**. As a result of the suspensions, the IEP team also met on November 27, 2023, to review Student's IEP and behavior plan. Parent Exh., pp. 74-88. The team doubled Student's direct instruction for each of literacy, math, and social skills to 300 minutes per week, which correspondingly reduced the amount of transitioning time for Student. Parent Exh., p. 81. Student's behavior plan was also reviewed and revised by the IEP team. Parent Exh., pp. 93-98.

14. **November 30, 2023, OSS.** On November 30, 2023, Student became upset when another student "bumped into him during indoor PE." His behavior escalated to throwing items and attempting elopement. Student twice grabbed another student by the shirt collar, choking the student and swinging his fist at him. Student had to be pulled off the other student by three adults. Student received a five-day OSS. Dist. Exh., p. 576.

15. **December 7, 2023, IEP Team Meeting – Annual Review**. At the annual review of Student's IEP, which Parents' attorney and Student's advocate (Alumbaugh) attended, the IEP team amended the IEP, which now contains the following:

- Direct instruction in social skills, math, and English language arts, 300 minutes per week of each, placing Student in the regular education classroom 57.14% of the time. Student has nine goals for English language arts, five goals for math, and three goals for behavior.

- 15 minutes per week (60/month) of occupational therapy consultation is provided.
- A temporary one-on-one paraprofessional is provided for seven hours each day.
- Accommodations are included.

Parent Exh., pp. 107-136. At the meeting, Parents requested that Dr. Barnes, BCBA, provide behavioral training, and District agreed to consider it. Parent Exh., p. 148. Parents also expressed a concern for the dyslexia curriculum being used. Id. The IEP team noted that Student's mental health therapy sessions increased from one to two per week "to assist and support behavioral concerns, strategies, and interventions." Id. Student's Behavior Support Plan was also amended. Parent Exh., pp. 143-145.

16. **December 12, 2023, Pediatrics Plus Occupational Therapy Evaluation**. On December 12, 2023, Parents presented Student for an occupational therapy evaluation by Pediatrics Plus. Parent Exh., p. 455. The evaluation report acknowledges the autism diagnosis of May 2023 by DDC. Id. Pediatrics Plus administered the BOT-2, including four fine motor subtests: fine motor precision, fine motor integration, manual dexterity, and upper-limb coordination." The report states that Student "presented with moderate to severe delays in all areas of the BOT-2." Id., p. 456. The report further states that Student exhibited a "moderate delay in social/cognitive skills" on the Pediatric Evaluation of Disability Inventory-Computer Adaptive Test (PEDI-CAT). Id., p. 457. Finally, the report includes clinical observations concerning Student's sensory processing, as follows:

Conduct: [Student] almost always can be stubborn and uncooperative, has temper
tantrums, resists eye contact, and frequently rushes through
coloring/writing/drawing, seems more active than same aged children, and does
things in a harder way than is needed.

Social Emotional: [Student] almost always seems to have low self-esteem, needs
positive support to return to challenging situations, is sensitive to criticisms, has
definite predictable fears, expresses feeling like a failure, is too serious, has strong
emotional outbursts when unable to complete a task, struggles to interpret body
language or facial expression, gets frustrated easily, has fears that interfere with
daily routines, is distressed by changes in routines/plans/expectations, interacts or
participates in groups less than same aged children, and frequently has difficulty
with friendships. Id., p. 459.

17. **December 13, 2023, MDR**. On December 13, 2023, District conducted an MDR, for

the incident that occurred on November 30, 2023. District notes that this is the sixth time Student

has been suspended during the 2023-2024 school year (third grade) for "a total of sixteen days."

Parent Exh., p. 142. According to Student's attendance records, the actual total number of days

Student was suspended in the first four months of his third-grade year is seventeen. Dist. Exh., p.

672.

## E. **Academics**

Father testified that Student began regressing in second grade. Tr. Vol. III, p. 92.

Comparing Student's RIT scores from NWEA MAP testing Spring 2022 (end of second grade)

to Fall 2023 (beginning of third grade), Student's RIT scores in math dropped precipitously

(from a 174 RIT score to 156). Parent Exh., p. 541. Yet, Student's scores regained lost ground

and by the Fall 2023 NWEA MAP testing, his RIT score in math was a 189, grade level. Id.

Similarly, and despite his continued behavioral struggles in the third grade, Student's STAR

math test scores rebounded by November of his third-grade year, from a grade equivalent of 2.1

in STAR Math at August 22, 2023, to a grade equivalent of 3.1 at November 26, 2023. Parent

Exh., p. 542.

Morris testified that by the end of the second grade, Student was behind more than two grade levels in reading. Tr. Vol. I p. 185. She also testified that he had difficulty with testing both behaviorally and academically. Tr. Vol. I, p. 179. In September, 2023, Student's NWEA MAP reading scores were below mean (29th percentile) for growth and for achievement (7th percentile). Dist. Exh., pp. 606-607. His language arts achievement score was also below mean (6th percentile). Dist. Exh., pp. 615-616. Nevertheless, by the end of the second grade, Student's grade equivalency on the STAR Reading test given on April 6, 2023, was 3.3, above third grade level. Parent Exh., p.535. By November of Student's third-grade year, Student was clearly struggling behaviorally with seven days of suspension in November, before the STAR tests were administrated. Dist. Exh., p. 672. District asserts that at April 6, 2023 (end of second grade), Student's STAR Reading score was 3.3, "considerably above grade level." Dist. Post-Hearing Brief, p. 9. Yet, this ignores evidence that Student's reading level dipped from a grade equivalent of 2.1 at August 23, 2023, to a grade equivalent of 1.8 at November 26, 2023 (mid-point of third grade). Parent Exh., p. 525. Further, NWEA MAP testing for third grade indicates a Lexile Level of BR-145L-5L, a beginning reader level that Blanton testified is mid to end of kindergarten. Parent Exh., p. 503, 505; Tr. Vol. II, p. 11.

## LAW AND DISCUSSION

Pursuant to Part B of the IDEA, states are required to provide a FAPE for all children with disabilities between the ages of three and twenty-one. 20 U.S.C. § 1412(a); 34 C.F.R. § 300.300(a). In 1982, in *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, the U.S. Supreme Court addressed the meaning of FAPE and set out a two-part analysis that must be made by courts and

hearing officers in determining whether a school district has failed to provide FAPE as required by federal law. 458 U.S. 176, 206-07 (1982).

The first part of the analysis determines whether the district complied with IDEA procedural requirements. Procedural inadequacies are violations only if they (a) impede the child's right to a FAPE; (b) significantly impede the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the parents' child; or (c) cause a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii).

In the second part of the *Rowley* analysis, a court or hearing officer must determine whether the district met the IDEA's substantive requirements. A district must develop an IEP that is "tailored to the unique needs of a particular child" (*Rowley*, 458 U.S., at 181, 102 S. Ct. 3034), and is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 197, L. Ed. 2d 335 (2017).

## A. **Procedural Violations**

The IDEA requires that once a child is identified as potentially having a disability, a school district **must** conduct "a full and individual evaluation to determine if the child is a child with a disability … and to determine the [child's] educational needs." 34 C.F.R. § 300.301. The child must be "assessed in all areas related to the suspected disability." 34 C.F.R. § 300.304(c)(4).  Parental consent for the evaluation is required. 34 C.F.R. § 300.300(a)(1).

Parents argue that District committed a procedural violation because it did not evaluate Student for the special learning disability of dyslexia. Parent Post-Hearing Brief, p. 7. The IDEA does not require District to classify Student by a particular diagnosis. The Eighth Circuit has held that, generally, a specific diagnosis will "be substantively immaterial because the IEP will be

tailored to the child's specific needs." *Fort Osage R-1 Sch. Dist. v. Sims ex rel. B.S.*, 641 F.3d 996, 1004 (8th Cir. 2011). District points out that Student's IEP references Student's dyslexia services in the Consideration of Special Factors and PLAAFP sections of the IEP. Dist. Post-Hearing Brief, p. 17-18; *See also* Parent Exh., p. 220. Further, District argues that Student "made significant progress toward diminishing his reading deficits." Dist. Post-Hearing Brief, p. 17. I do not agree with that assessment. While Student may have progressed with the dyslexia intervention services, his third grade NWEA MAP test for reading clearly indicates that Student is a third-grader with beginning reader (kindergarten level) skills.

Dyslexia was not Student's only disability affecting his reading skills. The DDC report was clear in its recommendations for a speech/language evaluation to address pragmatic social skills and an occupational therapy evaluation to address the need for behavioral services, and to address sensory processing issues and Student's difficulty with handwriting. District relies on the numerous IEP meetings, and IEP and behavior plan amendments as evidence of District's procedural compliance. Yet, the repeated IEP meetings, multiple MDRs, functional behavioral analysis, and consultative occupational therapy employed by District appear to do little or nothing to stem the tide of Student's suspensions, ultimately totaling seventeen days in a four-month period. District's occupational therapy initial evaluation conducted on October 2, 2023, did not even recognize the DDC's diagnosis of autism, much less address its recommendations. Indeed, the evaluator testified that she did not know about the diagnosis and had not seen the report. District argues that the occupational therapy evaluation conducted by Shipman was "extremely thorough." Dist. Post-Hearing Brief, p. 20. Yet, when viewed in light of Student's autism, and the challenges to the testing validity made by Dr. Morrison, the evaluation falls substantially short of providing a basis for the IEP team to develop a program of school-based

behavioral interventions and therapy. The evaluation was a missed opportunity at best, and at worst a procedural violation of the IDEA that impeded Student's right to a FAPE.

## B. Substantive Violations

Every IEP, pursuant to the IDEA, in order to be "tailored to the unique needs of the child," must include the following: (1) a statement of a student's present levels of academic achievement and functional performance; (2) a description of how a student's disability affects his or her involvement and progress in the general education curriculum; (3) annual goals that are measurable, as well as a description as to how progress toward stated goals will be measured; and (4) a description of special education and related services provided to student. 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV). The failure to implement those services identified in the IEP may constitute a substantive violation of the IDEA. The Eighth Circuit held in 2003 that "we cannot conclude that an IEP is reasonably calculated to provide a free appropriate public education if there is evidence that the school actually failed to implement an essential element of the IEP that was necessary for the child to receive an educational benefit." *Neosho R-V School Dist. v. Clark*, 315 F.3d 1022 (8th Cir. 2003).

Parents argue that District denied Student a FAPE by either failing to develop an appropriate IEP or in implementing his IEP, Behavior Management Plan and Crisis Plan, which resulted in his disability-related maladaptive behaviors at school negatively affecting his academic progress. It is difficult to point to any one IEP amendment or an area of implementation as a District failure, but it is clear that the IEP programming and its implementation were not working for Student. His sensory issues, social skills deficits, and maladaptive behaviors continued to increase despite District's efforts. Even after Student was given seventeen days of suspensions, and Student's NWEA MAP and STAR reading and

language arts scores had dropped, District was still unwilling to entertain the prospect that its programming or its staffing were not successful in meeting Student's educational needs. District's occupational therapy evaluation failed to fully evaluate all suspected areas of Student's disabilities and was, therefore, insufficient to provide a basis for meaningful, education-related strategies to meet Student's needs. Student's IEP, therefore, did not contain programming sufficiently tailored to Student's unique educational needs resulting from his autism, fine motor deficits, and sensory issues.

### C. Compensatory Education

A student is entitled to compensatory education and services to remedy any educational or other deficits that result from the denial of FAPE. *See School Comm. of Burlington v. Department of Education*, 471 U.S. 359, 374, (1985); *Parents of Student W. v. Puyallup School Dist., No. 3*, 31 F.3d 1489 (9th Cir. 1994) (ruling that "the hearing officer's ability to award relief [is] coextensive with that of the court..."(citing *Cocores v. Portsmouth, NH, School Dist.*, 779 F. Supp. 203 (D. N.H. 1991)). Because District's failure to fully evaluate Student impeded Student's right to a FAPE, Student is entitled to compensatory education.

Parents originally requested in their Complaint compensatory education in the form of: first, an occupational therapy evaluation by an evaluator of their choice; second, a contract between District and a private BCBA approved by Parents to conduct an FBA, to help the IEP team develop a BIP, and to train Student's teachers and support staff on implementation of the BIP to the extent this remains an issue; and third, other compensatory education for lost learning time resulting from suspensions, and the inappropriate IEP and/or the District's failure to implement his IEP. Parents withdrew the first request for an occupational therapy evaluation. On

the third request, there was no evidence presented as to what that the compensatory education should be quantitatively in terms of time or qualitatively in terms of content.

The second request for a contract with a private BCBA remains as the most cogent request for relief. District should, at its expense, contract with a private BCBA of Parents' choosing to consult on the development of amendments to and implementation of Student's IEP and behavior management plan, consistent with the private occupational therapy evaluation of Student obtained by Parent and including any staff training recommended by the BCBA. The BCBA shall be a member of Student's IEP team at District's expense for the entire 2024-2025 school year.

## ORDER

**IT IS, THEREFORE, ORDERED** as follows:

(1) The District's Due Process Complaint filed in case H-24-27 is **DISMISSED WITH PREJUDICE**;

(2) Parents' disability discrimination claims under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165, and claims for retaliation based on the disability discrimination claims and for the exercise of Student's free speech rights under the First and Fifth Amendments to the U.S. Constitution, are **DISMISSED WITHOUT PREJUDICE**;

(3) Parents' request for private placement tuition is **DENIED**.

(4) District is **ORDERED** to contract with a BCBA of Parents' choice to consult with District concerning the development of amendments to and implementation of Student's IEP and behavior management plan, to include any staff training recommended by the BCBA. The

BCBA shall be a member of Student's IEP team at District's expense for the entire 2024-2025 school year.

## FINALITY OF ORDER AND RIGHT TO APPEAL

The decision of this Hearing Officer is final. A party aggrieved by this decision has the right to file a civil action in either Federal District Court or a State Court of competent jurisdiction, pursuant to the Individuals with Disabilities Education Act, within ninety (90) days after the date on which the Hearing Officer's Decision is filed with the Arkansas Department of Education.

Pursuant to Arkansas Department of Education, Special Education and Related Services (February 2024), Section 10.20.9, the Hearing Officer has no further jurisdiction over the parties to the hearing.

**IT IS SO ORDERED.**

*/s/ Cheryl L. Reinhart*

**Cheryl L. Reinhart**
**HEARING OFFICER**

**DATE: June 4, 2024**

**ARKANSAS DEPARTMENT OF EDUCATION**
**Special Education Unit**

IN RE:

XXXXXXXXXXXXXXXXXXX, Parents of                    **PETITIONER**
XXXXXXXXXXXXX, Student

VS.                          **CASE NO. H-24-48**

**Pulaski Co. Special School District,** District                    **RESPONDENT**

## HEARING OFFICER'S FINAL DECISION AND ORDER

### ISSUES PRESENTED:

Whether the Pulaski County Special School District (hereinafter "District" or "Respondent") denied XXXXXX (hereinafter "Student") a free, appropriate, public education (hereinafter "FAPE") between January 9, 2024 and May 23, 2024 in violation of certain procedural and substantive requirements of the Individuals with Disabilities in Education Act of 2004, 20 U.S.C. §§ 1400-1485, as amended (hereinafter referred to as "IDEA"), which requires an analysis of the following sub-issues:

(1) whether the District provided Student FAPE in a timely manner by providing appropriate supports and services to address Student's characteristics of Dyslexia, academic deficits in the areas of reading and math, and behavior;

(2) whether the District can prospectively provide Student FAPE; and

(3) whether Compass Academy is an appropriate placement for Student.

### PROCEDURAL HISTORY:

This matter is the second of two hearings between these parties. Parents filed Due Process Complaint H-24-27 on December 21, 2023 and then Due Process Complaint H-24-

EXHIBIT B

30 on January 8, 2024. Those two cases were consolidated for purposes of the first hearing by the prior Hearing Officer. The prior Hearing Officer issued her Order in consolidated matters H-24-27 and H-24-30 on June 4, 2024 in that matter, with a finding in favor of Petitioners that the District denied FAPE to Student between January 8, 2022, and January 8, 2024. *See* Order in Consolidated H-24-27 and H-24-30 ("Case 1"). The request for private school placement was denied, with no analysis of the issue. The complaint in this matter, H-24-48 ("Case 2"), picks up on January 9, 2024, where Case 1 left off.

On May 23, 2024, Petitioners, the Parents and legal guardians of Student, filed a request for a due process hearing in Case 2 pursuant to the Individuals with Disabilities in Education Act ("IDEA"). The IDEA requires "[a] parent or agency [to] request an impartial due process hearing within two years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint . . ." 20 U.S.C § 1415(f)(3)(c). The State of Arkansas recognizes this same limitations period. *Ark. Dept. of Educ. Special Educ. And Related Services,* 10.00 Mediations and Hearings, § 10.01.4.6(A). The Eighth Circuit Court of Appeals also applies a two-year statute of limitations period under the IDEA. *See In the Matter of Minnetonka v. M.L.K., by and through his Parents, S.K.,* 2021 U.S. Dist. LEXIS 37609, 2021 WL 780723, at *6 (D. Minn. Mar. 1, 2021). "Any claim of a breach falling outside of the IDEA's two-year statute of limitations would be untimely." *Indep. Sch. Dist. No. 283 v. E.M.D.H.,* 960 F.3d 1073, 1083 (8th Cir. 2020). Here, the issues occurring prior to January 9, 2024 were determined by the prior Hearing Officer in her Order in Consolidated H-24-27 and H-24-30. Thus, the time period from January 9, 2024 to May 23, 2024 is at issue in this matter, although the facts from Case 1 are pertinent to some issues of fact and law.

Parents requested the hearing in Case 2 because they believed that District failed to comply with the IDEA, as well as regulations set forth by the Arkansas Department of Education, by failing to provide Student with appropriate supports and services to address Student's deficits in reading, writing and behavioral skills. *See* Petitioners' Complaint in Case 2. In Case 2, Parents seek the remedy of private school placement. *Id.*

In response to Parents' request for hearing, the Department assigned the case to this impartial Hearing Officer who initially scheduled the due process hearing in Case 2 for July 1-3, 2024 with a prehearing conference on June 27, 2024. Parties failed to reach resolution, and there was no resolution conference. See Prehearing Conf. Tr. p. 7-8. Prior to the prehearing conference, Petitioner filed a motion for continuance on June 24, 2024, as the hearing dates conflicted with both Petitioner's and Respondent's attorneys' summer schedules. Respondent did not object to the continuance, and the continuance was granted for good cause shown. Thereafter, September 17-19, 2024 was set as the date on which a hearing would commence. Prior to the prehearing conference scheduled for September 16, 2024, Petitioner filed a request for continuance on September 3, 2024 requesting that the hearing schedule be continued/adjusted to September 18, 19 and 24, 2024 due to scheduling in another matter in federal court. Respondent did not object and was available on September 24, 2024, and the continuance was granted for good cause.

Having been given jurisdiction and authority to conduct the hearing pursuant to Public Law 108-446, as amended, and Arkansas Code Annotated §§ 6-41-202 through 6-41-223, Debby Linton Ferguson, J.D., Hearing Officer for the Arkansas Department of Education, conducted a closed impartial hearing. This Hearing Officer ruled that Parents had the burden of proof, and Parents non-IDEA federal claims were dismissed without

prejudice. See Case 2 Tr. Vol. I p. 6-7, Case 2 Prehearing Tr. p. 18-19. [1] The parties agreed to incorporate the administrative record from Case 1 (H-24-27 and H-24-30) into the record for Case 2 (H-24-48). Id. at p. 15; Case 2 Tr. Vol. I p. 6-7. The hearing began as scheduled, and testimony was heard on September 18-19, 2024.    Parents were represented by Theresa Caldwell and District was represented by Jay Bequette. Also, present for the hearing were XXXXX ("Mother"), XXXXX ("Father") (together "Parents"), XXXXX (Student's grandfather), Audie Alumbaugh ("Parent Advocate"), Stephanie Cole ("LEA"). The following witnesses testified in this matter: LEA, Superintendent, Ellen Morris ("Special Education Teacher"), Ruby Blanton ("General Ed. Teacher"), Michele Pickett ("Principal"), Ebony Keaton ("School Behavior Specialist"), Courtney Williams ("Compass Director") and each of the Parents.    After two days of testimony, it appeared that two additional days would be required to complete the hearing, and the parties agreed to continue the hearing to the two consecutive dates of October 23 and 24, 2024, in lieu of September 24, 2024. However, the hearing concluded on October 23, 24.   Both parties were offered the opportunity to provide post-hearing briefs in lieu of closing statements, and both parties submitted a timely brief for consideration.

## FINDINGS OF FACT:

In the role of factfinders, special education hearing officers are charged with the responsibility of making credibility determinations of the witnesses who testify. *Independent Sch. Dist. No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 561 (8th Cir. 1996); *Parrish v.*

---

[1] Case 1 P. Ex. means Consolidated H-24-27 and H-24-30 Parent exhibit, Case 1 D. Ex. means Consolidated H-24-27 and H-24-30 District exhibit, and Case 1 Tr. means Consolidated H-24-27 and H-24-30 transcript volume. Case 2 P. Ex. means H-24-48 Parent exhibit, Case 2 D. Ex. means H-24-48 District exhibit, and Case 2 Tr. means H-24-48 transcript volume.

*Bentonville Sch. Dist.*, No. 5:15-CV-05083, at *8 (W.D. Ark. March 22, 2017). This Hearing Officer found each of the witnesses who testified to be credible in that they all testified to the facts to the best of their recollection; minor discrepancies in the testimony were not deemed to be intentionally deceptive. Any inconsistencies were minor and did not play a role in this hearing officer's decisions. The weight accorded the testimony, however, is not the same as credibility. Some evidence, including testimony, was more persuasive and reliable concerning the issues to be decided.

The findings of fact were made as necessary to resolve the issues; therefore, not all of the testimony and exhibits were explicitly cited. In reviewing the record, the testimony of all witnesses, and each admitted exhibit's content were thoroughly considered in issuing this decision, as were the parties' post hearing briefs.

## I. FINDINGS OF FACT FROM THE PERIOD OF CONSOLIDATED H-24-27/H-24-30

### A. Background

At the time of the Complaint in Case 1, Student was a nine-year-old male in the third grade, had been enrolled at District in Robinson Elementary School since kindergarten. Student suffered from extreme neglect until he was adopted (along with his sister) by Parents when he was less than two years old. Case 1 Tr. Vol. III p. 57. At age four, Student was diagnosed with attention deficit hyperactivity disorder ("ADHD") and Unspecified Disruptive, Impulsive-Control, and Conduct Disorder. Case 1 P. Ex. p. 407. Student was also evaluated for occupational therapy services by The Allen School, a school for the treatment of children with intellectual and developmental disabilities, and determined to need only consultative occupational therapy services. Case 1 P. Ex. p. 481-484. Student attended preschool at The Allen School for two years, then enrolled in kindergarten at District. Case 1

Tr. Vol. III p. 58-59. Father testified that, at that time, Student was "very intelligent" but his social skills were an issue, although not "severely pronounced," he had sensory issues (for example, things that touched him, loud noises, lots of activity), was somewhat oppositional, and sucked his thumb. Case 1 Tr. Vol. III p. 59-61. Nonetheless, Student did well in pre-kindergarten, kindergarten, and first grade, according to Father. Case 1 Tr. Vol. III p. 59-62.

Student was first referred for special education in kindergarten on September 17, 2020, and District determined that he was eligible for special education services on December 18, 2020. Case 1 P. Ex. p. 302. The evaluation conducted by District noted that Student had below average cognitive ability and "a wide range of academic scores." Case 1 D. Ex. p. 17, 22. The evaluation also noted reading comprehension and math as strengths, but stated that Student showed weaknesses in "basic reading skills, math calculation skills, and writing skills, including spelling." Case 1 D. Ex., p. 22. The evaluator recommended special education eligibility under Other Health Impairment ("OHI") based on the evaluation and his diagnoses at that time of ADHD and Unspecified Disruptive, Impulse-Control, and Conduct Disorder. Id. at p. 23. District identifies Student's initial eligibility determination date as December 18, 2020. Id. at p. 27-28. As Student's eligibility date falls in December, his IEPs are reviewed in the middle of each school year, covering the last half of one school year and the first half of the next.

### B. 2021-2022 School Year (7/1/21 to 6/30/22) – First Grade

Father testified that in first grade, Student exhibited more "push back when given a directive." Case 1 Tr. Vol. III p. 62. On October 27, 2021, Student's IEP team met to consider the need for a functional behavioral assessment ("FBA"). Case 1 P. Ex. p. 299. The team noted that Parents were considering seeking an evaluation for Autism from the UAMS Dennis

Developmental Center ("DDC"), but due to the waiting period District would consider a crisis/safety plan for Student. Case 1 P. Ex. p. 299-300.

Student's IEP for the period of 12/16/21 to 12/16/22 (mid-first grade to mid-second grade) (Case 1 P. Ex. p. 346-355), provided special education services of 30 minutes each per day of direct instruction in literacy and math, and related services of 60 minutes per month for occupational therapy consultation. Case 1 P. Ex. p. 351. The IEP also provides multiple accommodations for Student (Id. at p. 350), strategies for behavior management (Id. at p. 349), one goal for literacy, and one goal for math (Id. at p. 352).

The IEP team met on January 13, 2022 to discuss Student's classroom behavior, and develop a behavior management plan. See Case 1 P. Ex. p. 337-341. Then, on March 8, 2022, the IEP team met to create a Crisis Plan to address Student's elopement tendencies. Case 1 P. Ex. p. 346, 365-367. The IEP team also sought parental consent for an assessment to determine whether Student needed a one-on-one paraprofessional. Case 1 P. Ex., p. 346, 368.

## C. 2022-2023 School Year (7/1/22 to 6/30/23) – Second Grade

### 1. School-based Mental Health Services.

During the second grade, Student began receiving school-based mental health services from Youth Home, provided by Ann Smith. Case 1 Tr. Vol. I p. 161. Special Education Teacher testified that the school-based mental health services were privately funded and were not provided through Student's IEP. Id. Special Education Teacher testified that she had invited Ann Smith to Student's IEP meetings. Id. at p. 164. Principal testified that Ann Smith met with Student weekly and had a "good rapport" with Student. Case 1 Tr. Vol. II p. 124-125. District would call on her at times for her assistance during behavioral problems and her office was one of Student's "safe places." Id.

**2. Dyslexia Diagnosis and Services.**

Second grade marked the initiation of District providing dyslexia intervention services to Student. Case 1 Tr. Vol. I p. 17. At that time, his Lexile score was at a beginning reader level. Id. Morris testified Student had handwriting and written expression deficits also. Id. at p. 23, 76. On November 30, 2022, a Level 1 Dyslexia Screener was administered to Student, with the results showing that Student was considerably below expected level in decoding, word recognition, fluency rate, spelling/encoding, written expression, and comprehension. Case 1 P. Ex. p. 573. Parent consented to a Level 2 Dyslexia Screening, and on January 5, 2023, Parents provided consent for District to begin providing services in the Dyslexia Program. Case 1 P. Ex., p. 571. Principal testified that Student began receiving dyslexia services on March 2, 2023. Case 1 Tr. Vol. II p. 144. Dyslexia services were not part of Student's IEP, because, as Pickett explained, "In Pulaski County, because we diagnose characteristics of dyslexia, it is part of the general education." Case 1 Tr. Vol. II p. 178.

According to the testimony of several witnesses, Student was exposed to at least three different reading programs:

• Special Education Teacher used Phonics First, a phonics curriculum approved by the Department as a dyslexia curriculum. She chose Phonics First because it had a strategic and systematic, multi-sensory approach that she believed would be beneficial for her students with reading fluency issues (Case 1 Tr. Vol. I p. 93-94);

• Blanton, Student's Regular Education Teacher, used the District's Benchmark curriculum for reading (Case 1 Tr. Vol. II p. 95); and

• The "dyslexia person" used the Sonday System to deliver dyslexia intervention services to Student (Case 1 Tr. Vol. II p. 95).

RaDiah Reynolds, a Certified Academic Language Therapist ("CALT") and speech-language pathologist, testified as an expert witness for Parents. Case 1 Tr. Vol. III, p. 104. Ms. Reynolds worked in dyslexia intervention since 2018 and has been a speech-language pathologist since 2010. Id. When Reynolds was asked whether using multiple reading programs could pose a problem for Student, given his characteristics of Autism and clear difficulties with reading comprehension and written expression, she replied that it would be very confusing for a student with a language disorder. Case 1 Tr. Vol. III p. 152. However, it is not uncommon for educators to pull from different reading programs to address a student's individualized needs. Case 1 Tr. Vol. III p. 150. She also pointed out that she did not see much progress in Student's dyslexia worksheets that she reviewed from Parents exhibits. Case 1 Tr. Vol. III p. 142.

### 3. 12/9/22, IEP Annual Review.

District conducted the annual review of Student's IEP on December 9, 2022, of his second-grade year. Case 1 P. Ex. p. 220-230.

### 4. April 12 and 18, 2023 Incidents.

Student was suspended from school on April 13, 2023 and April 20, 2022 (Case 1 D. Ex. p. 224, 668, 670-671), for the following behavioral incidents described on the subsequent Manifestation Determination Review ("MDR"):

• April 12, 2023, [Student] pushed a student so hard that the student crushed his glasses against a pole and he also tried to run away from the school campus after this incident and security had to run after him to make sure he was safe. Id.

• April 18, 2023, right before NWEA testing Ms. Sinh and Mrs. Willmuth tried to get [Student] to get off his laptop to get into the NWEA test and got mad because he had to get

off his game. He told the teachers to "get out of my business!" and "get away from me." Id.
After Mrs. Willmuth took his laptop away, he ran out of the classroom and the school
building. Ms. Sinh chased after him to make sure he did not run into Highway 10. Case 1 D.
Ex. p. 224.

### 5. May 1, 2023, IEP Team Meeting.

The IEP team met on May 1, 2023, to review Student's IEP in light of his recent
behavioral incidents and discipline. Case 1 P. Ex. p. 241-250. The IEP team amended the IEP
by adding strategies for behavior management, and amended Student's behavior plan and
crisis safety plan. Case 1 P. Ex. p. 257.

### 6. May 2, 2023, PBIS Major Referral; OSS.

On May 2, 2023, Student was involved in a behavioral incident primarily over
attempts to have him stop using his computer. Case 1 D. Ex. p. 173-176. Student was
screaming and yelling at his teachers, eventually kicking and knocking over items in the
library. Id. After trying to elope, Student hit and kicked the School Resource Officer, and
threatened to kill him and the behavior specialist who was assisting. Id. The officer
handcuffed Student to a chair, and Student continued the behaviors. Id. Mother was called to
the school. Id. Student received a five-day out of school suspension ("OSS"), but was allowed
to return to school one day early, because "[District] recognizes the importance of being in
school." Case 1 D. Ex. p. 174-176.

### 7. May 4, 2023, Dennis Development Center Evaluation.

Student was evaluated for possible Autism by the UAMS Dennis Development Center
("DDC") on May 4, 2023. See Case 1 P. Ex., p. 400-422. As a result of the evaluation, DDC
diagnosed Student with "Autism Spectrum Disorder, without accompanying basic language

impairment, without accompanying intellectual impairment, and requiring level 1 support in the area of social communication and level 2 support in the area of restricted, repetitive behaviors." Id. at p. 405-406, 417. The DDC report recommends that Student "be considered for placement into speech-language therapy services through the local school district to address deficits in social/pragmatic language skills," and considered for "direct occupational therapy services ... given his difficulties in the school setting," particularly to "address sensory processing issues [and] difficulty with handwriting." (emphasis added) Id. p. 405, 417. Mother testified that District advised her that based on those evaluations, "the pragmatic speech and OT therapy were not necessary for learning in school, that was like a life skill, not at school." Case 1 Tr. Vol. IV p. 65.

### 8. May 8, 2023, IEP Team Meeting.

The IEP team met again on May 8, 2023, for the purpose of discussing Student's May 2 behavior incident and the need to update his IEP, behavior plan, and crisis plan. Case 1 P. Ex. p. 224-225, 266. The team added 30 minutes per day of social skills direct instruction, and "brainstormed ideas" on updates to the behavior plan and crisis plan. Id. Parents advised the IEP team at that meeting that Student was evaluated by the DDC for possible Autism on May 4, 2023, but did not yet have the DDC report. Id. The IEP team amended the IEP (Case 1 D. Ex. p. 213), amended Student's Behavior Management Plan (Case 1 D. Ex. p. 235-240), and completed a form entitled Functional Assessment Analysis of Problem Behavior (Case 1 D. Ex. p. 224-233). Special Education Teacher admitted this is not an FBA but is form that is part of the behavior analysis done for the MDR. Case 2 Tr. Vol. I p. 72-73.

### 9. May 8, 2023, MDR.

The IEP team also conducted an MDR of Student's May 2 behavior incident on May 8,

2023, which resulted in a five-day suspension. Case 1 D. Ex. p. 224-225. However, there are no days of suspension shown in Student's attendance record. Case 1 D. Ex. p. 671.

### 10. Receipt of DDC Evaluation Report.

Parents provided a copy of the DDC report to District on or about the last day of school. Case 1 Tr. Vol. IV p. 64. A copy of the report bearing a date stamp of June 7, 2023, appears at Case 1 D. Ex. p. 179. The DDC report confirmed that Student was diagnosed with Autism without accompanying impairment of basic language skills and without intellectual impairment, and the DDC recommended the maximum time allowed in all areas of therapy recommended, including ABA therapy, behavioral counseling, speech therapy for pragmatic language/social skills, and occupational therapy to address Student's fine motor skills deficits and sensory issues. Case 1 D. Ex. p. 181-182; Case 2 Tr. Vol. I p. 43. The DDC report also documented that Student was carrying a stuffed character on the date of the evaluation. Case 2 P. Ex. p. 214.

### D. 2023-2024 School Year (7/1/23 to 1/8/24) – Third Grade

#### 1. July 12, 2023, IEP Team Meeting.

On July 12, 2023, the IEP Team met, by video conferencing, to review the DDC evaluation that provided a new diagnosis of Autism. See Case 1 P. Ex. p. 1-15, 17-18. The IEP team for this meeting consisted of Parents and two persons from the District -- Melissa Kilpatrick, serving in the roles of special education teacher, general education teacher, and LEA representative, and Rebecca Smith, the individual there to interpret evaluation results. Case 1 P. Ex. p. 10, 17-18.

Although Parents had provided a copy of the full DDC evaluation to District, the IEP team told Parents at the meeting that they did not have a copy; Parents emailed a copy to

District during the meeting. Case 1 Tr. Vol. IV p. 64. As a result of the new diagnosis, the team approved new evaluations for achievement, executive function, behavior, and sensory processing. Case 2 P. Ex. p. 17. The team amended the IEP to add a new behavior goal and revised Student's accommodations. Id. at p. 1-17. Student was in general education 86% of the time, although it was noted that small group instruction was necessary for Student to acquire skills specified in the IEP, behavior intervention strategies established in the child's IEP require a degree of structure that cannot be implemented in a large group setting, and child's behavior significantly impeded his or her learning and that of others, and additional individualized instruction is needed to facilitate learning. Case 2 P. Ex. p. 1, 8, 17.

### 2. Evaluations.

### (a) 9/14/23 Specialized Reevaluation.

As approved in the July 12, 2023 IEP meeting, the specialized reevaluation was conducted by Rebecca Smith, M.S., District's licensed school psychology specialist on September 14, 2023. Case 2 P. Ex. p. 17; Case 1 P. Ex. p. 372-399. The report recommends that Student "meets eligibility criteria for special education services under the IDEA category of Autism." Id. at p. 392. Conclusions from the evaluation included:

- ... multiple characteristics of his ASD diagnosis affecting his acquisition of educational objectives as well as socially.

- ...significant adaptive skills deficits in Communication, Functional Academics, and Social areas...

- [BASC-3 adaptive scores] At-Risk and/or Clinically Significant score [both school and home settings] in ... Aggression, Conduct Problems, Depression, Attention Problems, Atypicality, Adaptability, Leadership, Anger Control, Bullying, Emotional Self-Control,

Executive Functioning, Negative Emotionality, Resiliency, ADHD Probability, Autism Probability, Emotional Disturbance Probability, and Functional Impairment...

• [BRIEF-2 Scores (teacher form)] ... Clinically Elevated ratings in the areas of Inhibit, Self-Monitor, Shift, Emotional Control, and Working Memory with Potentially Clinically Elevated scores in Initiate, Plan/Organize, and Organization of Materials ...

• [KTEA-3 academic skills] ... below average abilities in basic reading skills, reading comprehension, math problem solving, math calculation, and silent reading fluency, and word recognition fluency ... [and] significant deficits in written expression and decoding abilities. Id.

**(b) 9/8/23 Occupational Therapy Initial Evaluation.**

Also, as approved at the July 12, 2023 IEP meeting, an occupational therapy initial evaluation was completed. Case 2 P. Ex. p. 17. The occupational therapy initial evaluation was conducted on September 8, 2023, by Missy Shipman, an occupational therapist employed by District. Case 1 Tr. Vol. IV p. 112. Shipman has a master's degree from the occupational therapy program at the University of Central Arkansas. Id. In her report dated October 2, 2023, Shipman concluded that consultative occupational therapy services would be sufficient for Student stating: "[Student]'s delays in executive functioning skills, social skills, and sensory sensitivity and avoidance do affect his ability to participate in grade level activities ... [but] can be adequately addressed through consultative occupational therapy services ... [of] 15 minutes ... each week." Case 1 D. Ex. p. 273.

Shipman's conclusion was strongly challenged by Dr. M. Tracy Morrison, who testified as an expert witness for Parents. See Case 1 Tr. Vol. III p.7-54. Dr. Morrison is an occupational therapist with advanced post-doctoral training for four years in cognitive neuroscience. Case

1 Tr. Vol. III, p. 7; P. Ex. p. 732-737. Dr. Morrison developed assessments for executive functioning that are used as "gold standard" in occupational therapy and psychology. Case 1 Tr. Vol. III pp. 7-8. She now also operates a school, Engage, for 130 students, and provides outpatient behavior, speech, and occupational therapy services. Id. The school specializes in students who have ADHD, autism, and high anxiety. Id.

Morrison testified that she had reviewed District's occupational therapy evaluation, and it was her opinion that the District OT evaluation failed to identify Student's problem because the examiner did not go deeper in her evaluation. Id. at p. 25. The person who completed the Sensory Profile-2 screener did not have enough experience for the screener to be valid. Id. at p. 28. The evaluation measures Student's Visual-Motor Integration ("VMI") score at 1.4 standard deviations below average, but his visual perception is above average and motor coordination is average. Case 1 Tr. Vol. III p. 21; P. Ex. p. 467. Morrison testified that the evaluator should have conducted a Bruininks Oseretsky Test of Motor Proficiency ("BOT") to determine the reason for Student's low VMI in light of the results for visual perception and motor coordination. Case 1 Tr. Vol. III p. 21-24. While the evaluator recognized that Student's drawing patterns "were immature," citing that he drew bottom to top and right to left, she stated that "this did not affect the quality of his performance." Id. p. 24- 25; Case 1 P. Ex. p. 467. Dr. Morrison testified that the evaluator's opinion should not negate the qualitative test data, and the evaluator should have gone deeper with the testing to determine why Student's VMI was so low. Id. If Student was struggling with fine motor skills, "he is going to fall behind in writing, possibly reading, he is going to struggle with precision, line, shapes, writing words, that he is probably going to experience a fair amount of anxiety when it comes to writing assignments... [I]t is like asking a five-year-old to do third

grade work and then grading them at that level." Id. at p. 26. Dr. Morrison further questioned the validity of the School Function Assessment and the Sensory Profile of the evaluation. Id. p. 28-33. Morrison testified that if a student falls below one standard deviation on the Sensory Profile, then occupational therapy intervention is required, and Student's OT needs could not be met with 15 minutes of consultative services weekly. Id. at p. 34. Finally, Dr. Morrison testified that the executive functioning testing was not a standardized test with quantitative data. Id. at p. 36-37.

Shipman's report does not mention the DDC evaluation and diagnosis of Autism. In fact, Shipman admitted that she was not aware of the diagnosis, and District did not provide her with the report "until well after" her evaluation. Case 1 Tr. Vol. IV p. 132-133. While she conducted the evaluation on September 8, 2023, Shipman noted in her October 2, 2023, consultation notes that she discussed with the IEP team "executive functioning and Dennis Developmental report," noting that Student's diagnosis was changed to Autism. Case 1 P. Ex. p. 489. Shipman testified that knowing that diagnosis would be a considerable influence on her evaluation of Student. Id. Yet, two months later, Shipman's 2022-2023 Occupational Therapy Annual Review dated December 8, 2023, still does not reference the diagnosis of Autism or the DDC evaluation. See Case 1 P. Ex. p. 474-475. Shipman also testified that she did not know that Student was still sucking his thumb in the third grade, and that it was "concerning." Case 1 Tr. Vol. IV p. 132.

### 3. September 21, 2023, OSS.

On September 21, 2023, Student had a PBIS Major Referral for exiting the classroom without permission, taking and refusing to release a balloon, walking into other classrooms, and slapping a teacher on the leg. Case 1 D. Ex. p. 589. Student received a one-day OSS. Id.

**4. October 2, 2023, IEP Team Meeting.**

The IEP team met on the morning of October 2, 2023, to review the DDC evaluation, the new specialized evaluation, and new occupational therapy evaluation. Case 1 D. Ex. p. 324. The team adopted the occupational therapist's recommendations and added some accommodations to "help with executive functioning concerns." Case 1 P. Ex. p. 21. The team also noted his primary diagnosis as Autism. Case 1 P. Ex. p. 36.

**5. October 2, 2023, OSS.**

On the afternoon of October 2, 2023, Student left his classroom, and was intercepted by the School Resource Officer and another teacher. Case 1 D. Ex. p. 587. Upon his return to the classroom, he threw a Chromebook, knocked over a desk, and left the classroom again. Student received a two-day OSS. Id.

**6. October 13, 2023, IEP Team Meeting.**

The IEP team met as a result of Student's October 2nd behavior incident. Case 1 P. Ex. p. 39-40. Parents requested the District consider one-on-one paraprofessional support for Student following the OSS. Id.  The IEP Team further considered changing Student's IDEA category to Autism, which they decided was appropriate, and considered a paraprofessional for Student due to his October 2nd behavior incident, and the team considered providing a temporary paraprofessional as part of a student support assessment for determining if a permanent paraprofessional would be beneficial for Student.  Case 2 P. Ex. p. 54-57.  The team added services for instruction and a goal to support his needs in the area of emotional control. Case 1 P. Ex. p. 49. His behavior plan was revised and the Check-in/Check-out sheets amended to match the behavior goals. Parents raised for discussion that Student's use of the Chromebook leads to behavior problems and removal of the Chromebook was discussed, but

the District decided not to remove Student's access to the Chromebook. Case 1 P. Ex. p. 57. The Notice of Action documents that Parents were considering ABA therapy for behavioral support at that time. See Case 2 P. Ex. p. 58.

### 7. October 16, 2023, OSS.

On October 16, 2023, Student became upset when his teacher locked his Chromebook, left his classroom, and went to another room where he locked himself in. Case 1 D. Ex. p. 585. When the door was unlocked, he ran to another office, turned chairs over, hit his mental health counselor, and eloped from the building. Id. Student received a one-day OSS. Id.

### 8. October 23, 2023, OSS.

On October 23, 2023, Student received a PBIS Major Referral resulting in a three-day OSS, for arguing with his teacher over unifix cubes and his Chromebook, then escalating to throwing items off of her desk, leaving the classroom, cursing his mental health counselor when she encountered him, knocking over desks and a utility cart, slapping his teacher twice, and throwing objects at a student. Case 1 D. Ex. p. 582.

### 9. October 27, 2023, IEP Team Meeting.

The IEP team met again to discuss Student's problematic behaviors, and to again discuss a one-on-one paraprofessional to support Student. Case 1 P. Ex., p. 59. The team decided to delay adding a permanent paraprofessional until a student support assessment could be conducted, and instead provided a temporary student support paraprofessional. Case 1 P. Ex. p. 71, 74, 146. The Notice of Action further states, "Robinson Elementary has requested behavior support services with the district Behavior Intervention Specialist. [Student]'s parents are considering ABA therapy for behavior support at this time. Id. Although Student's amended IEP reflects that he remained in general education 86% of the

time, the IEP Placement Change form reflected that Student's placement would thereafter be in the resource classroom 40-79% of the school day. Case 1 P. Ex. 69; Case 2 P. Ex. p. 59. It was still noted that small group instruction was necessary for Student to acquire skills specified in the IEP, behavior intervention strategies established in the child's IEP require a degree of structure that cannot be implemented in a large group setting, and child's behavior significantly impeded his or her learning and that of others, and additional individualized instruction is needed to facilitate learning. Case 2 P. Ex. p. 65. The one-on-one temporary paraprofessional was added to Student's IEP after the October 27, 2023 IEP meeting. Case 1 P. Ex. p. 74, 146.

**10. October 30, 2023, OSS.**

On October 30, 2023, Student received another PBIS Major Referral resulting in a one-day OSS after becoming upset when asked to put his Chromebook away, and his behavior escalated to walking around the room knocking things off the teacher's desk, throwing items, kicking book bins and knocking books onto the floor. Case 1 D. Ex. p. 583.

**11. November 3, 2023, OSS.**

Student received a PBIS Major Referral when, on November 3, 2023, he became angry about putting away his Chromebook, and escalated into threatening to throw his Chromebook, chairs, and cool-down crate at the teacher. Case 1 D. Ex. p. 580. Student began yelling at the teacher and School Resource Officer to "shut the [f***] up; shut the hell up." He then threw items out of the cool-down area, and hit the School Resource Officer. Student was given a three-day suspension. Case 1 D. Ex. p. 580.

**12. November 13, 2023, MDR and OSS.**

On November 13, Student received a PBIS Major Referral when he "told another

student to shut the [f***] up and then got up from his seat and got in the other student's face and said, 'I'm about to knock your face off.' ..." Case 1 D. Ex. p. 577-578. Student received a four-day OSS, which OSS brought the number of days that Student has been suspended since the first of school to twelve. Case 1 District. Ex. p. 672.

### 13. November 27, 2023, IEP Team Meeting.

As a result of the most recent suspensions, the IEP team met on November 27, 2023, to conduct an MDR, review Student's IEP, and behavior plan. Case 1 P. Ex. p. 91-92, 74-90, 93-98. The team first conducted an MDR and determined that Student's behaviors were a result of his disability. Case 1 P. Ex. p. 91-92, 224, 244. After Student's manifestation review, on November 27, 2023, the IEP team reviewed Student's BIP and added interventions that had been included on Student's prior BIP or IEP from 2022. See Case 1 P. Ex. p. 93-98, 224, 244, and 339. Student's behavior plan was also reviewed and revised by the IEP team. Case 1 P. Ex. p. 93-98. Also, at that meeting, the team amended the IEP to reflect that Student's special education minutes had doubled, were to be provided in the resource or self-contained classroom, and reduced Student's time in regular class to 57% of the time per week citing that small group instruction was necessary for Student to acquire skills specified in the IEP, behavior intervention strategies established in the child's IEP require a degree of structure that cannot be implemented in a large group setting, and child's behavior significantly impeded his or her learning and that of others, and additional individualized instruction is needed to facilitate learning. See Case 1 P. Ex. 23; Case 2 P. Ex. 86.

### 14. November 30, 2023, OSS.

On November 30, 2023, Student became upset when another student "bumped into him during indoor PE." Case 1 D. Ex. p. 575-576. His behavior escalated to throwing items

and attempting elopement. Student twice grabbed another student by the shirt collar, choking the student and swinging his fist at him. Student had to be pulled off the other student by three adults. Student received a five-day OSS. Case 1 D. Ex. p. 576.

**15. December 7, 2023, IEP Team Meeting – Annual Review.**

At the December 7, 2023 annual review of Student's IEP, attended by attorneys for the District and Parent, as well as Parents' Advocate, the IEP team reported that Student progressed to 20% accuracy on the behavior goal added on July 12 and made no progress on the second behavior goal added on October 2 related to emotional control. See Case 1 P. Ex. p. 109, 148. The Team amended Student's IEP, to include the following:

• Direct instruction in social skills, math, and English language arts, 300 minutes per week of each, placing Student in the regular education classroom 57.14% of the time. Student has nine goals for English language arts, five goals for math, and three goals for behavior.

• 15 minutes per week (60/month) of occupational therapy consultation is provided.

• A temporary one-on-one paraprofessional is provided for seven hours each day.

• Accommodations are included.

Case 1 P. Ex. p. 107-136. At the meeting, District requested consent for an FBA, and Parents agreed that an FBA should be conducted. Case 1 P. Ex. p. 148. However, Parents requested that Dr. Barnes, BCBA, conduct it, and District agreed to consider it. Id. Also, at this meeting Parents objected to Student receiving instruction using multiple different dyslexia interventions, and the District interpreted this as a request to discontinue dyslexia intervention services. Case 1 P. Ex. p. 107, 148, 150; Case 1 Tr. Vol. I p. 201. Father testified he thought everyone agreed that Student would continue dyslexia services with Ms. Morris and receive homebound instruction, and Parents only did not want the Sonday program.

Case 1 Tr. Vol. III p. 204-207. The IEP team noted that Student's mental health therapy sessions increased from one to two per week "to assist and support behavioral concerns, strategies, and interventions." Id. Student's Behavior Support Plan remained in place pending additional behavior data. Case 1 P. Ex. p. 110, 143-146. Parents requested a speech therapy evaluation to determine if Student would benefit from pragmatics instruction. See Case 1 P. Ex. p. 107. Further, Parents requested Student be temporarily changed to homebound while Parents assessed his reaction to a new medication. See Case 1 P. Ex. p. 107; Case 1 Tr. Vol. III p. 202-203. Parents' requests were not granted, except Student's dyslexia services were discontinued entirely. See Case 1 P. Ex. 146-153.

**16. December 12, 2023, Pediatrics Plus Occupational Therapy Evaluation.**

On December 12, 2023, Parents presented Student for an occupational therapy evaluation by Pediatrics Plus. Case 1 P. Ex. p. 455. The evaluation report acknowledges the Autism diagnosis of May 2023 by DDC. Id. Pediatrics Plus administered the BOT-2, including four fine motor subtests: fine motor precision, fine motor integration, manual dexterity, and upper-limb coordination." Id. at p. 455-461. The report states that Student "presented with moderate to severe delays in all areas of the BOT-2." Id. at p. 456. The report then states that Student exhibited a "moderate delay in social/cognitive skills" on the Pediatric Evaluation of Disability Inventory-Computer Adaptive Test (PEDI-CAT). Id. at p. 457. Finally, the report includes clinical observations concerning Student's sensory processing, as follows:

> Conduct: [Student] almost always can be stubborn and uncooperative, has temper tantrums, resists eye contact, and frequently rushes through coloring/writing/drawing, seems more active than same aged children, and does things in a harder way than is needed.
>
> Social Emotional: [Student] almost always seems to have low self-esteem, needs positive support to return to challenging situations, is sensitive to criticisms, has definite predictable fears, expresses feeling like a failure, is too

serious, has strong emotional outbursts when unable to complete a task, struggles to interpret body language or facial expression, gets frustrated easily, has fears that interfere with daily routines, is distressed by changes in routines/plans/expectations, interacts or participates in groups less than same aged children, and frequently has difficulty with friendships. Id. at p. 459.

**17. December 13, 2023, MDR.**

On December 13, 2023, District conducted an MDR, for the incident that occurred on November 30, 2023, which was delayed at Parents' request. See Case 1 p. Ex. p. 141-142, 153. The Notice of Action from the MDR states, "the IEP team conducted a Functional Assessment Analysis of Problem Behavior," reviewed Student's BIP for positive interventions and supports, and reviewed Student's IEP for behavior goals related to target behaviors. See Case 1 P. Ex. p. 153, 663. Again, this is not an FBA but is part of the behavior analysis done for the MDR. Case 2 Tr. Vol. I p. 72-73. The BIP was unchanged. Compare Case 1 P. Ex. p. 93-94 and 143-44. Student's behavior was determined to be related to his disability, and Student was given assignments and services during the suspension. Id. Although Student's suspension was completed on December 6, 2023, Parent expressed that Student would remain at home through December 15, 2023 for monitoring due to a medication change. Case 1 P. Ex. p. 151. However, Student never returned to school after December 7, 2023. Case 2 P. Ex. p. 205.

**18. Fall 2023 Suspension Total**

At the December 13, 2023 meeting, District noted that this was the sixth time Student has been suspended during the 2023-2024 school year (third grade) for "a total of sixteen days," which the team determined constituted a change of placement. Case 1 P. Ex. p. 153. However, according to Student's attendance records, the actual total number of days Student was suspended in the fall semester of his third-grade year was seventeen. Case 1 P. Ex. p. 554; Case 1 Tr. Vol. II p. 147.

Principal admitted she knew the District's behavior plan for Student was not working prior to the December 7, 2023 meeting.  Case 1 Vol. II p. 148-150. The Special Education Teacher admitted that what the District was doing for Student's behavior was not working in December of 2023.  Case 2 Tr. Vol. I p. 46; Case 1 Tr. Vol. II p. 149.  In attempt to remedy this, Principal had contacted the District's Behavior Specialist, who was doing observations, the District had implemented the temporary one-on-one paraprofessional, the District was looking at increasing Student's social skills time with Ms. Morris, and the District asked for a new FBA at the December 7, 2023 annual review.  Case 1 Vol. II p. 150. District asserts it agreed to an FBA by Sheila Barnes around this time.  Case 2 Tr. Vol. I p. 43.  Special Education Teacher admitted the District was supposed to perform an FBA after an MDR, but the last FBA the District performed for Student was in 2022.  Case 2 Tr. Vol. I p. 74.  The Functional Analysis of Behavior form the District completed in the MDRs was not an FBA.  Id.

Father testified that at the last two meetings, in December 2023, the District had no plan to handle Student's behaviors, other than suspensions, day treatment or ALE and that Student's behavior was impacting his education, particularly his reading.  Case 1 Tr. Vol. IV. p. 21, 23, 27-30, 69.  Principal told parents, "I have no idea" and "I don't know what to do." Case 1 Tr. Vol. IV, p. 30.  Parents changed Student's medication in an attempt to help control Student's behavior in December 2023 and kept him home to monitor the effects of the new medication.  Case 1 Tr. Vol. II p. 149-150; Case 1 Tr. Vol. IV p. 28-30.

**19. January 5, 2024 District Letter**

By letter dated January 5, 2024, the District notified Parents that Student would be "dropped as a student" due to absences and that the matter would "be turned over to the Prosecuting Attorney." See Case 1 P. Ex. 171.  The District also filed Due Process Complaint

H-24-27 regarding an OT evaluation for Student, which later was dismissed with prejudice. Case 2 P. Ex. 379.

### 20. January 8, 2024 Due Process Complaint H-24-30

On January 8, 2024, Parents filed due process Complaint, H-24-30 (herein referenced as Case 1). See Case 2 P. Ex. p. 357; Case 1 Tr. Vol. III p. 222-225. In the hearing regarding Case 1, The District objected to testimony regarding the resolution conference that occurred on January 19, 2024 because the complaint in Case 1 was filed on January 8, 2024, so evidence beyond January 8, 2024 was beyond the scope of the complaint in Case 1. See Case 1 Tr. Vol. III p. 222-225. Parents request for reimbursement for private school placement was not plead in the complaint in Case 1 (H-24-30) filed on January 8, 2024. Compensatory education was the remedy pled in Case 1.

## E. Academics

Father testified that Student began regressing in second grade. Case 1 Tr. Vol. III p. 92. Comparing Student's RIT scores from NWEA MAP testing Spring 2022 (end of second grade) to Fall 2023 (beginning of third grade), Student's RIT scores in math dropped from a 174 RIT score to 156. Case 1 P. Ex. p. 541. However, by the Fall 2023 NWEA MAP testing, Student's RIT score in math was a 189, which was on grade level. Id. Similarly, in the third grade, Student's STAR math test scores rebounded by November of his third-grade year, from a grade equivalent of 2.1 in STAR Math at August 22, 2023, to a grade equivalent of 3.1 at November 26, 2023. Case 1 P. Ex. p. 542.

Morris testified that by the end of the second grade, Student was behind more than two grade levels in reading. Case 1 Tr. Vol. I p. 185. She also testified that he had difficulty with testing both behaviorally and academically. Case 1 Tr. Vol. I p. 179. In September, 2023,

Student's NWEA MAP reading scores were below mean (29th percentile) for growth and for achievement (7th percentile). Case 1 D. Ex. p. 606-607. His language arts achievement score was also below mean (6th percentile). Case 1 D. Ex. p. 615-616. District points to Student's STAR Reading test given on April 6, 2023, was 3.3, above third grade level. Case 1 P. Ex. p.535; Case 1 Dist. Post-Hearing Brief, p. 9. However, Student's reading level regressed to a grade equivalent of 2.1 on August 23, 2023, to a grade equivalent of 1.8 on November 26, 2023 (mid-point of third grade). Case 1 P. Ex. p. 525. By November of Student's third-grade year, Student was struggling behaviorally with seven days of suspension in November, before the STAR tests were administrated. Case 1 D. Ex. p. 672. Further, NWEA MAP testing for third grade indicates a Lexile Level of BR-145L-5L, a beginning reader level that Blanton testified is mid to end of kindergarten. Case 1 P. Ex. p. 503, 505; Tr. Vol. II p. 11.

## II. FINDINGS OF FACT IN H-24-28

1.      During the dates at issue in this matter, between January 9, 2024 and May 23, 2024, Student was a nine-year-old male (born in August 2014) in the third grade residing in Roland, Arkansas with Parents, which is in the District. See Case 2 Tr. II p. 83; Case 2 P. Ex. p. 214, 323.

2.      By letter dated February 1, 2024, Parents notified District of their intent to enroll Student in a private school and asked the District to agree to the change of placement because the District was not providing Student with research-based Dyslexia and Math instruction, the direct OT minutes requested. Case 2 P. Ex. 206-207. The letter also enclosed a copy of a letter from Student's doctor supporting homebound educational services through 2/21/24. Case 2 P. Ex. 206-208.

3.      District does not permit ABA therapy in its buildings, and the Special

Education Teacher did not request an exception for Student. Case 1 Tr. Vol. I p. 151-156. The District Behavior Specialist recalled that Student needed ABA Therapy, but she confirmed that the District does not provide ABA therapy, as a school policy. Case 2 Vol. II p. 60-63. The District only provides STAR for Autism, which is only appropriate for students with impaired development, and Student does not have impaired intellectual development. Case 2 Vol. II p. 61; Case 2 D. Ex. p. 183.

4.    The District's Behavior Specialist was in her second year in that position in the District in the fall of 2024. Case 2 Vol. II p. 57. The District's Behavior Specialist has certifications in special education and administration, but she has no certifications related to behavior or behavior interventions, although she did complete BCBA and Crisis Intervention training through the Arkansas Department of Education. Id. and p. 67. The District Behavior Specialist did not recall being provided with the DDC evaluation diagnosing Student with Autism. Case 2 Vol. II p. 59. She also confirmed that an FBA consists of observations and data collection to assess the functions of behaviors. Case 2 Vol. II p. 68.

5.    On February 12, 2024, Parents again notified District by letter of their intent to enroll Student in a private school, in addition to the reasons cited in the February 1, 2024 letter, because the District did not provide Student with the homebound services requested after the conclusion of Christmas break. Case 2 P. Ex. p. 209, and that same day, Parents enrolled Student in Compass Academy, a private school. Case 2 P. Ex. p. 323.

6.    Courtney Williams is the Director (again "Compass Director") of Compass Academy ("Compass"). Case 2 Tr. Vol. III p. 9.

7.    Upon enrollment, Student was a third grader and was assessed in reading and math to begin instruction at an appropriate level. Case 2 Tr. Vol. III p. 12-13, 16. Student was

assessed as "end of first grade" or "first of second grade" level in math and on a second-grade level in reading. Case 2 Tr. Vol. III p. 12. Compass provides reading instruction using the Wilson Reading Program, an intensive intervention designed for children with learning disabilities like dyslexia, and instruction occurs in small groups. Id. at p. 14. By April of 2024, on Benchmark testing, Students words correct had increased to 77 words from 43 in February and his accuracy increased from 89 percent in February to 93 percent in April. Id. at p. 13. His retelling went from 15 to 22, and his comprehension increased to 85 percent in April from 60 percent in February. Id. at p. 13. Student's DRA assessment showed he was at a Level 10 in reading in May of 2024, which is mid to high first grade. Id. at p. 14. When he arrived at Compass, he was reading words but did not want to read a book; he said it was too hard. Id. at p. 13. Student appears to be really benefitting from the Wilson Reading Program at Compass because he comes in with a chapter book he is reading now instead of a stuffed animal. Case 2 Tr. Vol. III p. 15-16.

8.      Regarding Student's behavior, Compass Director testified that, at first, Student did not want to interact with anybody – students or staff. Case 2 Tr. Vol. III p. 11, 18. At first, Student cursed, yelled, and destroyed some property. Id. at p. 18. The Compass staff learned how to connect with him, were consistent, and built trust. Case 2 Tr. Vol. III p. 18, 33. When trust and consistency were established, the behaviors decreased. Id. at p. 19, 33. On April 3, 2024, Student's social skills percentile rank on the Social Skills Improvement System Rating Scale (SSIS) was at the second percentile. Case 2 P. Ex. p. 349. Compass staff has taught Student social-emotional skills, for example, to tell staff when he is angry using appropriate words and volume, and coping skills so he could self-regulate. Case 2 Tr. Vol. III p. 19. The staff tracks Student's behavior, so they can monitor progress. Id. at p. 26. Student had 17

behavior episodes from February 12 to July 30, 2024 (2.8 per month), and only 7 behavior episodes from August 1, 2024 to October 23, 2024 (2.3 per month). Case 2 Tr. Vol. III p. 20, 25-28. Student's destruction of property and physical aggression have shifted more to verbal altercations. Id. at p. 37.

9.      Compass Director testified Student receives speech therapy and occupational therapy at Compass from licensed therapists. Case 2 Tr. Vol. III p. 40.

10.      Student also receives counseling from the Compass school counselor. Case 2 Tr. Vol. III p. 19. The Compass school counselor is also responsible for implementing Student's crisis plan to de-escalate Student when he has an outburst. Id. at p. 20. She was called frequently in the beginning, but the frequency decreased around summer time. Id. at p. 20. Now, Student will ask to see the counselor if he is struggling, instead of being destructive. Id. at p. 20.

11.      Further, Compass Director testified that Student is also receiving 25 hours per week of Applied Behavior Analysis ("ABA") therapy at Compass. Case 2 Tr. Vol. III p. 21. ABA therapy began in August of 2024, has helped identify Student's triggers, and has worked to teach Student to cope with them. Id. at p. 21-22. ABA therapy is provided at Compass for Student by Reach Therapy; Student's ABA therapy is primarily pushed into Student's class. Id. at p. 22-24. Student's ABA therapy is provided by an RBT, and a BCBA works with them several times throughout the week. Id. at p. 25. With ABA therapy, Student's inappropriate words have lessened a lot, and he will hesitate before speaking inappropriately now, which shows developing awareness and impulse control. Id. at p. 37.

12.      Compass has IEP goals for Student, and Student is making progress on the goals. Case 2 Tr. Vol. III p. 30-32; Case 2 P. Ex. p. 324-32.

13.     There are around three or four non-disabled students in the classes for grades fourth through sixth. Case 2 Tr. Vol. III at 55. Student's homeroom teacher is a licensed and certified teacher, and his teachers for math, history, and literacy are licensed and certified special education teachers. See Case 2 Tr. Vol. III p. 54-55.

14.     Compass is a year-round school, August through July. Case 2 Tr. Vol. III p. 49. Tuition is $9,500.00 per year. Id. There is a $200.00 new student fee and a $150.00 renewal fee each year. Id.

15.     Parents filed the complaint in H-24-48 (Case 2) on May 24, 2024. *See* Complaint H-24-10, requesting a remedy of reimbursement for private school tuition. See Case 2 Complaint.

16.     The transcripts and exhibits from Case 1 reflect that private school tuition reimbursement was not raised in Case 1. To have fully heard the issue of whether private school tuition reimbursement was appropriate for Student as a remedy of its own, the scope of the hearing in Case 1 would have had to exceed the time period for consideration in Case 1, which was from January 8, 2022 to January 8, 2024. Case 2 P. Ex. p. 360. As noted in the discussion between counsel for the District and counsel for the Parent during the hearing in Case 1, nothing beyond January 8, 2024 was pertinent to the hearing in Case 1, and in fact, counsel for the District objected when Parent counsel began to discuss evidence dated beyond January 8, 2024. Case 1 Tr. Vol. III p. 223-225. Finding herself corrected on the date of filing the Complaint in Case 1, Parent counsel withdrew her questions pertinent to the period after January 8, 2024. Id.

17.     On May 24, 2024, the prior Hearing Officer received post-hearing briefs from the Parents and the District in Case 1. See Case 1 Post-hearing Briefs. The District's post-

hearing brief did not address a request for private school placement, and the Parent's post-hearing brief did not address private school placement as an issue but requested that the prior hearing officer consider order private school tuition reimbursement as a form of compensatory education.    Compensatory education was the remedy requested in the complaint in Case 1, not private school tuition reimbursement.

17.    On June 4, 2024, the prior Hearing Officer issued her Final Decision and Order in Case 1.  Case 2, P. Ex. p. 355-380.  The prior Hearing Officer found the District committed violations of the IDEA that denied Student a FAPE.  Id. at p. 176-78.  The prior Hearing Officer made no factual findings regarding dates beyond the filing date (January 8, 2024) of the complaint in Case 1, and she made no factual findings or legal conclusions regarding the issue of reimbursement for private school tuition as a remedy.  In response to Parent's request that the prior Hearing Officer grant reimbursement for private school tuition as a form of compensatory education, the prior Hearing Officer merely noted that "Parents' request for private placement tuition is denied." Case 2 P. Ex. p. 179. Neither party appealed the Final Decision and Order in Case 1.

## CONCLUSIONS OF LAW AND DISCUSSION:

### I. Issue and Claim Preclusion

Parents and District agree that the principles of issue and claim preclusion apply to administrative hearings held pursuant to IDEA.  See Parent Post-hearing Brief at p. 25-26 and District Post-hearing Brief at p. 11-13.  In support of their arguments, Parents cite *Alexander v. Pathfinder, Inc.*, 91 F.3d 59, 62 (8th Cir. 1996), *Indep. School Dist. No. 283 v. S.D.*, 88 F.3d 556, 562 (8th Cir. 1996), and *Mississippi Cnty. v. City of Blytheville*, 2018 Ark. 50, 10, 538 S.W.3d 822, 829 (2018).  In support of its arguments, the District cites *Ross ex. rel. Ross*

*v. Bd. Of Educ. Of Township High School. Dist. 211*, 486 F.3d 279, 282-85 (7th Cir. 2007); *Theodore v. District of Columbia*, 772 F. Supp. 2d 287, 293 (D.D.C. 2011); *Dutkevitch v. Pittston Area Sch. Dist.*, No. 3:12CV994, 213 U.S. Dist. LEXIS 103715, at *9 (M.D. Pa. July 24, 2013), and *Aetna Casualty & Sur. Co. General Dynamics Corp.*, 968 F.2d 707, 711 (8th Cir. 1992), *Lane v. Peterson*, 899 F.2d 737, 741 (8th Cir. 1990).

After reviewing cases cited by both parties, as well as other cases, this Hearing Officer finds that the principles of issue preclusion and claim preclusion may be applied to administrative hearings pursuant to IDEA. For issue preclusion to apply pursuant to Arkansas law, the following elements are required: (1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) it must have been determined by a valid and final judgment, and (4) the determination must have been essential to the judgment. *Mississippi Cnty. v. City of Blytheville*, 2018 Ark. 50; 538 S.W.3d 822, 829 (2018). Under Arkansas law, an unappealed administrative decision is a final judgment. *Alexander*, 91 F.3d at 62. When IDEA claims are exhausted through the administrative process, "principals of issue and claim preclusion may properly be applied to short-circuit redundant claims under other laws." *Indep. School Dist. No. 283* at 562.

In Case 1, the transcripts and exhibit books were filled with testimony and documents relevant to the issue of whether Student was provided FAPE between January 8, 2022 and January 8, 2024. Case 1 Tr. Vol. I, II, III, IV; P. Ex. 1-740 and D. Ex. p. 1-444. Parents pled the denial of FAPE in its Complaint in Case 1, and both post-hearing briefs discussed facts and law relevant to a finding of whether Student was provided FAPE between January 8, 2022 and January 8, 2024. See Case 1 Complaint and Case 1 Post-

hearing briefs by District and Parents.  Further, the prior Hearing Officer spent 15 pages of her Final Decision and Order in findings of facts relevant to the provision of FAPE to Student during the time at issue.  See P. Ex. p. 355-380.   Notably, the remedy requested in Case 1 was compensatory education, while the remedy requested in Case 2, at bar, is private school tuition reimbursement.  However, both remedies hinge on a finding that Student was denied FAPE.

**A. FAPE**

In analyzing whether issue preclusion applies to the Case 1 determination regarding FAPE, there is no doubt that the provision of FAPE in the time period at issue was actually and thoroughly litigated in Case 1, that it was determined by a valid and final judgment as there was no appeal of the Case 1 Final Decision and Order, or that the determination regarding FAPE was essential to the judgment rendered in Case 1. The prior Hearing Officer's Final Decision and Order plainly found that the District's:

> IEP programming and implementation were not working for Student.  His sensory issues, social skills deficits, and maladaptive behaviors continued to increase despite District's efforts.  Even after Student was given seventeen days of suspensions, and Student's NWEA MAP and STAR reading and language arts scores had dropped, District was still unwilling to entertain the prospect that its programming or its staffing were not successful in meeting Student's educational needs. District's occupational therapy evaluation failed to fully evaluate all suspected areas of Student's disabilities and was, therefore, insufficient to provide a basis for meaningful, education-related strategies to meet Student's needs, Student's IEP, therefore, did not contain programming sufficiently tailored to Student's unique educational needs resulting from his autism, fine motor deficits, and sensory issues.

Case 1 P. Ex. p. 377.  As the issue of the provision of FAPE from January 8, 2022 to January 8, 2024 was fully heard and adjudicated, this Hearing Officer will not disturb the determination of the prior Hearing Officer that Student was denied FAPE during the timeframe at issue in Case 1.

**B. COMPENSATORY EDUCATION**

After finding the District denied Student FAPE in Case 1, the prior Hearing Officer went on to analyze compensatory education for Student in light of the denial of FAPE, as compensatory education was the remedy pled in Case 1. Case 2 P. Ex. p. 378-379. The prior Hearing Officer granted Student compensatory education in the form of an order to the District to contract with the BCBA of Parents' choice. Case 2 P. Ex. p. 379. Notably, the prior Hearing Officer conducted no analysis of whether Student should be granted the remedy of reimbursement for private school tuition, as that remedy had not been pled and no evidence was heard to support such a finding. Case 2 P. Ex. p. 355-380. As with the provision of FAPE, this Hearing Officer will not disturb the determination of the prior Hearing Officer with regard to compensatory education.

**C. PRIVATE SCHOOL TUITION REIMBURSEMENT**

In contrast to the issues of FAPE and compensatory education for Student from January 8, 2022 to January 8, 2024, Private school tuition reimbursement was not raised in Case 1, except that Parents raised it in their post-hearing brief, as a possible form of compensatory education, and the prior Hearing Officer denied private school tuition reimbursement as a form of compensatory education, not as a remedy of its own. To have fully heard the issue of whether private school tuition reimbursement was appropriate for Student as a remedy of its own, the scope of the hearing in Case 1 would have had to exceed the time period for consideration in Case 1, which was from January 8, 2022 to January 8, 2024. As detailed above, counsel for the District objected when Parent counsel began to discuss evidence dated beyond January 8, 2024, and finding herself corrected on the date of filing the Complaint in Case 1, Parent counsel withdrew her questions pertinent to the

period after January 8, 2024. As detailed above, Student was not enrolled in Compass until February 12, 2024. Although this Hearing Officer appreciates the District's arguments regarding judicial efficiency, the issue of private school tuition reimbursement was not fully heard or adjudicated in Case 1 and could not have been heard or adjudicated in Case 1.

Moreover, the legal analysis required for private school tuition reimbursement differs from the analysis required to determine whether a Student should receive compensatory education. Regarding compensatory education, the Eighth Circuit has stated "[w]hether District is able to provide FAPE prospectively is irrelevant to an award of compensatory education," but a claim for private school tuition must include proof that the school district cannot prospectively provide a FAPE. *Indep. Sch. Dist. No. 283 v. E.M.D.H.*, 960 F.3d 1073, 1085 (8th Cir. 2020). In *Indp. Sch. Dist. No. 283 v. E.M.D.H. by & Through L.H.*, 357 F. Supp. 3d 876, 891 (D. Minn. 2019), the district court reversed an award of private school tuition as compensatory education finding, "there is scant evidence concerning whether the District can provide a FAPE prospectively."

As the prior Hearing Officer decided the District denied Student FAPE between January 8, 2022 and January 8, 2024, the sole remaining issue in Case 2, at issue here, is whether Student should receive reimbursement for private school tuition, which requires a determination of the sub-issues of (1) whether the District could prospectively provide Student with FAPE and (2) whether Student's private school placement is appropriate or "proper." The IDEA authorizes tuition reimbursement for placement in private schools in situations where a district is unable to provide an appropriate placement for a student and the private school placement, itself, is deemed appropriate. *See D.L. by Landon v. St. Louis City Sch. Dist.*, 950 F.3d 1057, 1066 (8th Cir. 2020). ADE Spec. Ed. Rules §10.01.22. *Sch.*

*Comm. of Town of Burlington, Mass. v. Dep't of Educ.*, 471 U.S. 359, 369 (1996). To receive the remedy of reimbursement for private school tuition, Parents must establish two requirements: that the school failed to provide a FAPE; and that the private school is an "appropriate" placement within the meaning of the IDEA. *Forest Grove Sch. Dist. v. T.A.*,557 U.S. 230, 242–43 n. 9, 129 S.Ct. 2484, 174 L.Ed.2d 168 (2009); *Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of Mass.*,471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

A claim for private school tuition must include proof that the private school "is an 'appropriate' placement within the meaning of the IDEA." *Sneitzer v. Iowa Dept. of Educ.*, 796 F.3d 942, 948 (8th Cir. 2015A private placement need not satisfy a least restrictive environment requirements to be appropriate. *C.B. ex re. B.B. v. Special Sch. Dist. No. 1, Minneapolis, Minn*, 636 F.3d 981, 991 (8th Cir. 2001). Although the IDEA does require that students with disabilities be educated in the least restrictive environment pursuant to 20 U.S.C. §1412(a)(5), the principal that IDEA does not sacrifice a student's access to FAPE to have him in a more integrated setting was recently confirmed by the Eighth Circuit Court of Appeals in *J.P. v. Belton School Dist. No. 124*, 40 F.4th 887 (8th Cir. 2022). Furthermore, to show an alternative placement for a student is "proper" within the meaning of IDEA, parents need not show the placement meetings state education standards. *T.B. ex rel. W.B. v. St. Joseph School Dist.*, 677 F.3d 844 (2012) (citing Individuals with Disabilities Education Act, § 601 et seq., 20 U.S.C.A. § 1400 et seq.). The Eighth Circuit Court of Appeals has previously held that movement to another school district does not prohibit a student from seeking compensatory education from a prior school district for violations of FAPE. *Indep. Sch. Dist. No. 283 v. A.C.*, 358 F.3d 769, 774 (8th Cir. 2001).

### 1. FAPE

As detailed above, the prior Hearing Officer determined in Case 1 that the District failed to provide Student FAPE from January 8, 2022 to January 8, 2024, and this Hearing Officer will not disturb those finding of fact or law.  Student received no education or services from the District after January 8, 2024, so no further analysis of FAPE is required or appropriate in this Case 2.

### 2. WHETHER THE DISTRICT CAN PROSPECTIVELY PROVIDE FAPE

Although no further analysis of the facts during the timeframe of Case 1 is required for a finding that the District did not provide Student FAPE from January 8, 2022 to January 8, 2024, the facts occurring during the timeframe of Case 1 are relevant to this Hearing Officer's determination of whether the District could prospectively provide FAPE.

Based on the record, the District's denial of FAPE to Student in Case 1 was not due to a failure to convene the IEP Team; instead, the District appeared to lack the tools Student needed to provide Student a FAPE.  As a second grader who was already diagnosed with ADHD and Impulse Control and Conduct Disorders, Student received his first suspension from school for behavior incidents occurring on April 12 and 18, 2023, and Student's IEP team met on May 1, 2023 in response.  On May 2, 2023, Student had another behavioral incident, as detailed above, and the IEP team met on May 8, 2023 in response.  Over the course of the spring 2023 and fall 2023 semesters, the team amended Student's IEP to add social skills instruction, added behavior goals, increased special education minutes in an attempt to reduce transitions and disruptions, attempted to adjust the behavior plan by adding strategies that had worked in the past, amended his crisis plan.  The IEP team amended the IEP, amended Student's Behavior Management Plan, and completed a form

titled Functional Assessment Analysis of Problem Behavior, which Special Education Teacher admitted is not an FBA but is part of the behavior analysis done for the MDR.

As a result of Student's diagnosis of Autism by DDC, the July 12, 2023 IEP Team approved new evaluations for achievement, executive function, behavior, and sensory processing and amended the IEP to add a new behavior goal and revised Student's accommodations. The District's specialized reevaluation occurred on September 14, 2023 and was conducted by Rebecca Smith, M.S., District's licensed school psychology specialist. The report recommends that Student "meets eligibility criteria for special education services under the IDEA category of Autism." Conclusions from the evaluation included: (a) multiple characteristics of his ASD diagnosis affecting his acquisition of educational objectives as well as socially; (b) significant adaptive skills deficits in Communication, Functional Academics, and Social areas; (c) [BASC-3 adaptive scores] At-Risk and/or Clinically Significant score [both school and home settings] in ... Aggression, Conduct Problems, Depression, Attention Problems, Atypicality, Adaptability, Leadership, Anger Control, Bullying, Emotional Self-Control, Executive Functioning, Negative Emotionality, Resiliency, ADHD Probability, Autism Probability, Emotional Disturbance Probability, and Functional Impairment; (d) [BRIEF-2 Scores (teacher form)] ... Clinically Elevated ratings in the areas of Inhibit, Self-Monitor, Shift, Emotional Control, and Working Memory with Potentially Clinically Elevated scores in Initiate, Plan/Organize, and Organization of Materials; and (e) [KTEA-3 academic skills] ... below average abilities in basic reading skills, reading comprehension, math problem solving, math calculation, and silent reading fluency, and word recognition fluency ... [and] significant deficits in written expression and decoding abilities.

The second evaluation that came out of the July 12, 2023 IEP Team meeting was

occupational therapy initial evaluation that was conducted on September 8, 2023, by Missy Shipman, an occupational therapist employed by District. Her report was issued on October 2, 2023 and concluded that 15 minutes of weekly consultative occupational therapy services was all that Student needed. However, Shipman's report does not mention the DDC evaluation and diagnosis of autism, and Shipman was not aware of Student's Autism diagnosis "until well after" her evaluation. Knowing that diagnosis would have considerably influenced Shipman's evaluation of Student.

Dr. M. Tracy Morrison, an occupational therapist with advanced post-doctoral training for four years in cognitive neuroscience, disputed Shipman's conclusion that Student's OT needs could be met with 15 minutes of consultative services for Student weekly did not align with the data in Shipman's report. Dr. Morrison testified that the evaluation was flawed because Shipman should have conducted a Bruininks Oseretsky Test of Motor Proficiency ("BOT") to determine the reason for Student's low VMI in light of the results for visual perception and motor coordination, but that was not done. In addition, Dr. Morrison questioned the validity of Shipman's School Function Assessment and the Sensory Profile of the evaluation. Dr. Morrison testified that if a student falls below one standard deviation on the Sensory Profile, then occupational therapy intervention is required, and Student's OT needs could not be met with 15 minutes of consultative services for Student weekly.

In the fall of 2023, in Student's third grade year, Student's behavior incidents and IEP meetings in response resumed. On September 21, 2023, Student received a PBIS Major Referral, and on October 2, 2023, the IEP Team met in response. At that time, Parents requested a para-professional for Student, and Student remained in general education 86% of the time. On October 2, 2023, Student had another behavior incident and received a two-

day OSS, which resulted in another IEP Team meeting on October 13, 2023. At the October

13, 2023, IEP Team changed Student's IDEA category to Autism and decided to provide a

temporary paraprofessional as part of a student support assessment. The Notice of Action

documents that Parents were considering ABA therapy for behavioral support at that time.

Again, on October 16, 2023 and on October 23, 2023, Student had behavior incidents,

which resulted in OSS. In response to the behavior incidents on October 16 and 23, 2023, on

October 27, Student's IEP team met again to discuss Student's behaviors and again discussed

a one-on-one paraprofessional to support Student. The team delayed adding a permanent

paraprofessional until a support assessment could be conducted and continued to provide a

temporary one-on-one paraprofessional. At that meeting, the team doubled Student's

special education minutes, to be received in the resource or self-contained classroom, and

reduced Student's time in regular class to 57% of the time per week citing that small group

instruction was necessary for Student to acquire skills specified in the IEP, behavior

intervention strategies established in the child's IEP require a degree of structure that cannot

be implemented in a large group setting, and child's behavior significantly impeded his or

her learning and that of others, and additional individualized instruction is needed to

facilitate learning.

Student continued to receive suspensions throughout the year even after he was

placed in the resource classroom for 43 percent of the school day. On October 30, 2023,

November 3, 2023, and November 13, 2023, Student had additional behavior incidents

resulting in OSS after each incident. In light of Student's most recent behavior incidents,

Student's IEP Team met again, on November 27, 2023. The team first conducted an MDR and

determined that Student's behaviors were a result of his disability. After Student's

manifestation review, on November 27, 2023, the IEP team reviewed Student's BIP and added interventions that had been included on Student's prior BIP or IEP from 2022.   On November 30, 2023, Student had a behavior incident in which resulted in a five-day OSS.

At the December 7, 2023 IEP meeting for Student's annual review, the team deferred the MDR at Parents' request and reported that Student progressed to 20% accuracy on the behavior goal added on July 12 and made no progress on the second behavior goal added on October 2 related to emotional control.   The BIP was not revised at this IEP meeting; the BIP from May 2023 remained in place.  Also, at this meeting Parents objected to Student receiving instruction using multiple different dyslexia interventions, and the District interpreted this as a request to discontinue dyslexia intervention services, although Parents thought everyone understood that Student was to continue to received dyslexia curriculum from the Special Education Teacher, and that only the Sonday program was to be discontinued. Parents requested a speech therapy evaluation to determine if Student would benefit from pragmatics instruction and an FBA by Dr. Shelia Barnes.  Further, Parents requested Student be temporarily changed to homebound while Parents assessed his reaction to a new medication.   After the meeting, Parents' requests were not granted, but dyslexia services were discontinued entirely.

On December 13, 2023, District conducted an MDR, for the incident that occurred on November 30, 2023. The IEP team determined that Student's "behavior was related to [his] disability," and make up work was provided to Student.  The Notice of Action from the MDR states, "the IEP team conducted a Functional Assessment Analysis of Problem Behavior," reviewed Student's BIP for positive interventions and supports, and reviewed Student's IEP for behavior goals related to target behaviors.  Again, this is not an FBA but is part of the

behavior analysis done for the MDR.  The BIP was unchanged. IDEA requires an FBA to be conducted after a manifestation determination review, or the IEP team can review the BIP and modify it.  See 20 U.S.C. §1415(k)(1)(F)(i).  Student struggled with behavior and had multiple MDR's between April and December of 2023; however, Student's last FBA was completed in 2022.

Although Student's suspension was completed on December 6, 2023, Parent kept Student at home through December 15, 2023 due to a medication change. Parents changed Student's medication in an attempt to help control Student's behavior in December 2023 and kept him home to monitor the effects of the new medication.

Student was suspended out of school for 17 days in the fall semester of his third-grade year.  Father testified that at the last two meetings, in December 2023, the District had no plan to handle Student's behaviors, other than suspensions, day treatment or ALE and that Student's behaviors were impacting his education.  Principal told parents, "I have no idea" and "I don't know what to do."  Principal admitted she knew the District's behavior plan for Student was not working prior to the December 7, 2023 meeting.  The Special Education Teacher admitted that what the District was doing for Student's behavior was not working in December of 2023.  In attempt to remedy this, Principal had contacted the District's Behavior Specialist, who was doing observations, the District had implemented the temporary one-on-one paraprofessional, the District was looking at increasing Student's social skills time with Ms. Morris, and asked for a new FBA at the December 7, 2023 annual review.  District asserts it agreed to an FBA by Sheila Barnes around this time.

Student's IEP Team was aware that Student needed small group instruction to acquire skills specified in the IEP, behavior intervention strategies established in the child's IEP

require a degree of structure that cannot be implemented in a large group setting, and child's behavior significantly impeded his or her learning and that of others, and additional individualized instruction is needed to facilitate learning. Based on the testimony of the Special Education Teacher, Teacher, the Compass Director, and Father, Student's ability to learn in the area of reading and other areas had been significantly impacted by his behavior.

The District received and reviewed the DDC evaluation recommending the maximum time allowed in all areas of therapy recommended, including ABA therapy, behavioral counseling, speech therapy for pragmatic language/social skills, and occupational therapy to address Student's fine motor skills deficits and sensory issues. ABA Therapy can be a related service if it is necessary to allow Student to access his education, and based on the DDC recommendations, Student's behavior and test scores in the fall of 2023, and Student's response to ABA therapy at Compass, this Hearing Officer finds ABA to be a related service necessary to allow Student to access his education during the period at issue. *See* 20 U.S.C. §1401(29); 20 U.S.C. §1414(d)(1)(A)(i)(IV), and *Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 143 S.Ct. 859 (2023), However, the District did not consider providing ABA therapy for Student due to the District's policy against doing so.

Due to the District's inability to reign in Student's behaviors over the course of the spring and fall semesters of 2023 despite alterations to special education time and changes in goals, the District's policy of not providing the ABA therapy Student needs to access his education at this time, the absence of District curriculum for Students who have Autism without intellectual impairment, and the failure to conduct an FBA over the course of 2023, Student's experienced a deprivation in his education, and for these reasons, this Hearing Officer finds that the District is unable to prospectively provide FAPE to Student.

### 3. WHETHER COMPASS IS AN APPROPRIATE PLACEMENT FOR STUDENT

From April to December of 2023, the general education and special education environments at the District resulted in educational deprivation to Student because the Student's behaviors were uncontrolled causing him to be removed from instructional time and suspended seventeen days in the fall of 2023, not to mention the educational time Student lost during the behavior incidents. Any social benefit Student may have received from being in the general education setting was certainly to the detriment of his education, and, as discussed above, Student's educational benefit cannot be sacrificed for LRE.

Parents placed Student at Compass on February 12, 2024, after requesting the District transfer his placement on February 1, 2024 and after notifying the District that the Parents were unilaterally placing Student at Compass on February 12, 2024. Regarding whether Student's placement at Compass is appropriate, the District acknowledged on Student's IEPs throughout 2023 that Student needed the small group and more structured setting to learn, and Compass provides that, allowing Student to receive his education and make progress. Although the form is different from that of the Arkansas Department of Education, Student has an IEP at Compass and is making progress toward his goals. This is evidenced by both his progress on test scores and that his interest has shifted from stuffed animals to books.

Compass has several nondisabled students in Student's classes. Student's reading and math teachers at Compass are certified in special education, and his other teachers are also certified in special education or in general education. Student receives 25 hours of ABA therapy per week with an RBT and supervising BCBA at Compass, as well as counseling, OT, and speech therapies, and those therapies are working to decrease the frequency and severity of Student's behaviors. With behavior issues minimized, Student is able to access

educational benefit and has consequently improved his reading and math scores considerably. After reviewing the ability of the Compass Academy, to provide Student's education, this Hearing Officer finds that Compass Academy is an appropriate placement for Student.

### 4. Transportation

When a hearing officer concludes that a school district failed to provide FAPE and the private placement was suitable, they must consider all relevant factors in determining whether reimbursement for some or all of the cost of the child's private education is warranted. *Forest Grove Sch. Dist. V. T.A.*, 557 U.S. 230, 247, 129 S.Ct. 2484 (2009). Under IDEA, a student's home school district remains responsible for transportation pursuant to 20 U.S.C. §1412(a)(10)(B)(i)(child placed in private school entitled to all IDEA rights); 34 C.F.R. §300.325(c) school district still responsible for compliance with IDEA); 20 U.S.C. §1401(26)(A)("Related Services means transportation ... "); 34 C.F.R. §300.34 (same); ADE Spec. Ed. Rules §2.56 (same). "Transportation includes [t]ravel to and from school and between schools." 34 C.F.R. §300.34.(c)(16). However, in Arkansas, a transfer student, who attends a school district through school choice, or the transfer student's parent is responsible for the transportation of the transfer student to and from the school in the nonresident district where the transfer student is enrolled. Ark. Code Ann. § 6-18-1904(d).

This Hearing Officer notes that Student lives in Roland, Arkansas and has attended the District since kindergarten. On the other hand, this Hearing Officer has broad discretion in crafting its remedy, the District's inadequacies detailed above are consequential, and the available compensatory remedies are limited. Student cannot go back and reclaim the quality instruction and therapy minutes lost in 2023, and Student is unlikely to be able to

benefit from additional therapy sessions beyond those that he is receiving in his full school days at Compass.  Therefore, this Hearing Officer grants Parents' request for reimbursement of transportation expenses as a portion of Parents' remedy.

## FINAL CONCLUSIONS AND ORDERS:

Upon consideration of all the testimony and evidence, this Hearing Officer finds that a preponderance of the evidence warrants the following:

1.    Pursuant to the prior Hearing Officer's findings of facts and law in Case 1 (Consolidated H-24-27 and H-24-30), the District denied Student FAPE during the period at issue.

2.    Finding the District is unable to prospectively provide Student FAPE and that Compass Academy is an appropriate placement for Student, this Hearing Officer grants the request for placement at Compass and reimbursement for one year's tuition of $9,500.00 and the new student fee of $200.  District shall reimburse parents within 60 days of the date of this Final Decision and Order.

3.    Parents request for reimbursement for transportation expenses is granted for the period from January 9, 2024 to December 31, 2024.  Within 60 days of Parents' production of Student's attendance record to establish the dates of travel and a print out of Google Maps or other reliable resource establishing the number of miles required to transport Student from home to Compass for school each day, District shall pay Parents mileage at the rate of 52 cents per mile for each mile Student was transported to and from Compass for school between January 9, 2024 and December 31, 2024.

4.    Parents also alleged that the District's conduct constitutes disability discrimination in the Consolidated Case pursuant to §504 of the Rehabilitation Act of 1973, 29 U.S.C. §794(a)

or Title II of the Americans' with Disabilities Act, 42 U.S.C. § 12131-12165. This Hearing Officer has no jurisdiction over disability discrimination claims. *See* ADE Spec. Ed. Rules §10.02.22.1. Therefore, to the extent Parents' due process complaints raise disability discrimination claims, those claims are dismissed.

### FINALITY OF ORDER AND RIGHT TO APPEAL:

The decision of this Hearing Officer is final. A party aggrieved by this decision has the right to file a civil action in either Federal District Court or a State Court of competent jurisdiction, pursuant to the Individuals with Disabilities Education Act, within ninety (90) days after the date on which the Hearing Officer's Decision is filed with the Arkansas Department of Education.

Pursuant to Section 10.01.36.5, *Special Education and Related Services: Procedural Requirements and Program Standards,* Arkansas Department of Education 2008, the Hearing Officer has no further jurisdiction over the parties to the hearing.

### IT IS SO ORDERED.

/s/ Debby Linton Ferguson

**HEARING OFFICER**

11/27/2024

**DATE**